## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

VIRNA BEULAH,

                Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION,

                Defendant.

CASE NO. 1:20-CV-02271

DISTRICT JUDGE DAVID A. RUIZ

MAGISTRATE JUDGE AMANDA M. KNAPP

**REPORT AND RECOMMENDATION**

       Plaintiff Virna Beulah ("Plaintiff" or "Ms. Beulah") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

       For the reasons set forth below, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further proceedings.  Upon remand, the ALJ should reassess the treating source opinion of psychiatrist Gary Wilkes, M.D., and articulate any findings as to the weight given to that opinion based upon an accurate and complete evaluation of Ms. Beulah's treatment records and other relevant evidence.

1

## I.  Procedural History

Ms. Beulah filed her SSI application on May 30, 2014, alleging disability beginning on March 9, 2012.  (Tr. 219, 284-89, 1521.)  She alleged disability due to stroke, lupus, asthma, Bell's Palsy, arthritis, manic depression, bipolar disorder, and anxiety.  (Tr. 205, 236, 244, 325).  Her application was denied at the initial level (Tr. 236-38) and upon reconsideration (Tr. 244-48).  Following her request for hearing (Tr. 249-51), a hearing was held before an Administrative Law Judge ("ALJ") on March 18, 2016 (Tr. 147-204).

On May 26, 2016, the ALJ issued an unfavorable decision, finding that Ms. Beulah had not been under a disability since May 30, 2014, the date the application was filed.  (Tr. 116-46.)  The Appeals Council denied Ms. Beulah's request for review of the ALJ's decision.  (Tr. 1-5.)  Following an appeal to the district court, the district court reversed and remanded the case for further administrative proceedings on July 30, 2018, ordering that on remand "the ALJ must reconsider with proper analysis and articulation as to the weight assigned to Dr. Wilkes's opinion" and "should also reconsider the RFC's exertional limitations with the assistance of the opinion of a medical expert, if appropriate."  (Tr. 1693-1703.)  The Appeals Council entered its remand order on February 23, 2019, noting that Ms. Beulah had filed a subsequent claim for SSI on June 6, 2016 and instructed the ALJ to consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claim.  (Tr. 1704-07.)

Pursuant to the remand order, a hearing was held before the same ALJ. (Tr. 1588-1622.)  On November 14, 2019, the ALJ issued an unfavorable decision, finding that Ms. Beulah had not been under a disability since May 30, 2014, the date the application was filed.  (Tr. 1518-44.)  Ms. Beulah filed exceptions to the ALJ's decision.  (Tr. 1876-80.)  The ALJ's November 14, 2019 decision became the final decision of the Commissioner after remand when, on September

10, 2020, the Appeals Council declined to assume jurisdiction finding the decision was supported by substantial evidence and consistent with applicable law and the decision complied with the orders of the District Court and Appeals Council.  (Tr. 1512-16.)  Ms. Beulah filed her present appeal on October 8, 2020.  (ECF Doc. 1.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Beulah was born in 1965.  (Tr. 156, 1534.)  She attended school through the eleventh grade, with some additional classes in 1994 and training in 2012.  (Tr. 156-57.)  Ms. Beulah last worked in 2012, cleaning office buildings.  (Tr. 159-61.)  She worked on and off at a fast-food restaurant from 2003 through 2007, had periodic employment through temp agencies during 2008 through 2010, and worked at a gas station.  (Tr. 159-64.)

### B. Medical Evidence

#### 1. Treatment History

##### i. Mental Health Treatment History

Ms. Beulah saw Todd Wagner, M.D. at Care Alliance Health Center – Carl B. Stokes ("CAHC") on December 13, 2013, to establish care with a new primary care physician.  (Tr. 456.)  She reported that her previous primary care physician was at St. Vincent, and that she had been admitted to inpatient psychiatric care at St. Vincent in August 2013 following an attempted overdose of sleeping pills.  (*Id*.)  She reported that it was not her first admission for suicidal ideation.  (*Id*.)  She reported previously taking psychotropic medications that included amitriptyline, sertraline, and Haldol.  (*Id*.)  Dr. Wagner observed Ms. Beulah's hygiene and grooming was maintained, she was "euthymic - brightens with interaction," her thoughts were organized, and she had no suicidal or homicidal ideation or plan.  (Tr. 457.)  She was diagnosed

with uncontrolled depression with anxiety, and Dr. Wagner increased her Prozac from 20 to 40 mg.  (*Id*.)

Ms. Beulah saw Dr. Wagner for a routine follow up on March 31, 2014.  (Tr. 455.)  She reported having a "[w]orsening mood recently."  (*Id*.)  She described initial improvement after the increase in her Prozac, but reported she had been feeling more depressed, paranoid, and hopeless over the prior few weeks, and was isolating herself.  (*Id*.)  Dr. Wagner observed that her hygiene was maintained, her thoughts were organized, and she denied suicidal/homicidal ideation or plan.  (*Id*.)  Her affect was flat, she was tearful throughout the visit, and she exhibited moderate eye contact.  (*Id*.)  Ms. Beulah was diagnosed with moderate-severe depression with anxiety.  (Tr. 456.)  Dr. Wagner continued her Prozac at 40 mg, added Risperdal 0.5 mg at bedtime, and instructed her to follow up in two weeks.  (*Id*.)

Ms. Beulah saw Dr. Wagner on June 17, 2014 for an "overdue" follow up.  (Tr. 543.) She had missed her last appointment because she was admitted to the hospital for chest pain. (*Id*.)  She reported that her mood and sleep were improved while on the combination of Prozac and Risperdal.  (*Id*.)  On examination, Dr. Wagner noted that she had a brighter and less restricted affect than previously, a "good" mood, her thoughts were organized, and she had no suicidal/homicidal ideation or plan.  (*Id*.)   Her medications were not changed.  (Tr. 544.)

When Ms. Beulah returned for a follow up with Dr. Wagner on July 29, 2014, she reported she was tolerating her medications and sleeping, but reported multiple family stressors and requested a change in her medications.  (Tr. 540.)  She was assessed with a recent worsening of depression with anxiety.  (Tr. 541.)  Dr. Wagner continued her medications and noted that she was scheduled for an initial assessment at Murtis Taylor Human Services ("Murtis Taylor") that week.  (*Id*.)

4

On August 4, 2014, Ms. Beulah presented for a mental health assessment at Murtis Taylor Human Services with Gina Moore, Therapist Professional Counselor (PC), seeking a psychiatric evaluation, medication, case management, and counseling.  (Tr. 467-478.)  She relayed feeling sad "all her life," stating "I have always felt disconnected from life."  (Tr. 467.)  She reported currently being medication compliant, but acknowledged she was not always compliant with her medication and had a history of fifteen suicide attempts during the period 1980-2012.  (Tr. 467, 469.)  She was only able to give a history of two of the suicide attempts.  (Tr. 467.)  She reported trying Zoloft in the past, but it did not help.  (Tr. 469.)  She reported being able to sleep well when medication compliant but indicated that her depressive mood kept her from living a productive life.  (Tr. 471.)  PC Moore made the following general observations: Ms. Beulah was well groomed, her speech was clear, and her eye contact and activity were average, but she was withdrawn.  (Tr. 472.)  PC Moore further noted that Ms. Beulah "presented with depressive mood as evidence by being withdrawn, tearful, and stating how sad she was feeling."  (Tr. 473.)  Treatment recommendations were: (1) psychiatric evaluation and medication; (2) case management to assist with pharmacological management, benefits and entitlements, and resources and community support; and (3) counseling to address depressive disorder and assist with development of coping skills.  (Tr. 474.)

On October 24, 2014, Ms. Beulah returned to see Dr. Wagner for a routine follow up.  (Tr. 521.)  She reported relationship problems with her boyfriend, but said she was handling it well.  (*Id*.)  She reported tolerating Prozac and Risperdal, attending weekly counseling sessions at Murtis Taylor, feeling that her depression was better and feeling less guilty over things that were not her fault.  (*Id*.)  However, she also reported sitting at home, not wanting to do things, crying all the time, feeling helpless and wanting to help her daughter who was homeless with her

kids and addicted to pain pills, and feeling that her anxiety was not being treated well at that time.  (*Id*.)  Dr. Wagner noted that her depression with anxiety was improving, but was not under optimal control given her symptoms.  (Tr. 522.)  He recommended that she continue with treatment at Murtis Taylor and continued her medications.  (*Id*.)

When Ms. Beulah returned to see Dr. Wagner on November 14, 2014, she reported her mood had been stable notwithstanding some stressors, but she was not sleeping well.  (Tr. 519.)  She was scheduled for follow up at Murtis Taylor the following month.  (*Id*.)

There is no record of follow up with Murtis Taylor in December, but Ms. Beulah did return to Murtis Taylor on January 26, 2015 for a psychiatric evaluation conducted by psychiatrist Irene Shulga, M.D. (Tr. 955-958.)  She reported problems with anxiety, worrying about her mother, isolating behavior, feeling afraid for her safety, chronic thoughts of death, self-mutilation, violence, hearing voices, anger over her nephew's death.  (Tr. 955.)  She stated that Prozac had once helped her relax, but no longer did.  (*Id*.)  Her reported daily activities included: watching television, crafting, cooking sometimes, and communicating only with family.  (*Id*.)  She reported having no friends.  (*Id*.)   On examination, she exhibited a constricted affect, soft speech, paranoia, thoughts of hurting the person who shot her nephew but without knowing the person and with no plan, and chronic suicidal ideation but with no intent to hurt herself.  (Tr. 957.)  There was no evidence of looseness of associations or flight of ideas with her thought processes or content.  (*Id*.)  The treatment record reflects a diagnosis of major depressive disorder, recurrent, severe and Dr. Shulga's assessment also notes: history of postpartum "depression < likely BAD [bipolar affective disorder]," history of violence and self-mutilation behavior, a mild risk of self-harm, and a moderate risk for violence.  (Tr. 957.)  Dr. Shulga adjusted Ms. Beulah's medications as follows: Risperdal was increased to 1 mg; Prozac was

6

decreased to 20 mg due to the possibility that the interaction between Prozac and tramadol, another medication she was taking, might be causing Serotonin syndrome; and hydroxyzine 10 mg twice per day, as needed, was added for anxiety.  (*Id*.)  Dr. Shulga also noted that she might consider adding a mood stabilizer such as Depakote or Lamictal.  (*Id*.)

Ms. Beulah returned to Dr. Shulga for pharmacological management on February 27, 2015.  (Tr. 958.)  Ms. Beulah reported some improvement in her mood, feeling less depressed, and feeling her mood and energy were "better," but reported feeling like a "zombie" on Risperdal and requested valium.  (Tr. 960.)  On examination, Ms. Beulah was casually dressed, her affect was dysphoric, her speech was nonspontaneous, her mood was "good," her thought content was good, there were no hallucinations, delusions, or suicidal/homicidal tendencies, and her judgment and insight were limited.  (Tr. 961.)  Dr. Shulga made no medication changes, noting that Ms. Beulah appeared "calm" and "relatively organized."  (Tr. 961-62.)  Dr. Shulga noted that she would continue to monitor for symptoms of "BAD."  (Tr. 962.)

Ms. Beulah returned to Dr. Shulga on April 27, 2015, reporting she missed an appointment because she had pneumonia.  (Tr. 966.)  She reported being "less depressed" and "managing [herself]," but having weird and scary dreams at night.  (*Id*.)  On examination, Ms. Beulah had a blunted affect, spontaneous speech, an okay mood, no paranoia, fair judgment and insight, she denied thoughts of self-harm, and displayed no signs of hallucinations while reporting always hearing voices when alone.  (Tr. 967.)  Dr. Shulga noted Ms. Beulah "[c]urrently seems doing better, chronic anxiety, no symptoms of BAD presently."  (Tr. 968.)  Dr. Shulga recommended decreasing Prozac to 20 mg[1] to rule out the "bad dreams" as a side effect as opposed to an organic sleep disorder, and continued Risperdal and hydroxyzine.  (*Id*.)

---

[1] Ms. Beulah's Prozac dose was previously decreased to 20 mg in January 2015.  (Tr. 957.)  It is not clear whether there was a subsequent increase prior to the noted decrease during the April 2015 visit.

Ms. Beulah returned to Dr. Shulga on August 24, 2015.  (Tr. 1161-1166.)  She reported her mood had worsened since her last visit.  (Tr. 1164.)  She reported having taken Abilify twice, but that it made her throw up.  (Tr. 1163.)  She also reported being off her medications completely, stating she had been unable to get her Prozac for two months.  (*Id*.)  Dr. Shulga noted that Ms. Beulah had not mentioned having issues getting her Prozac when she saw Dr. Shulga two weeks earlier.  (*Id*.)  Ms. Beulah expressed severe, suicidal thoughts with a plan to cut her wrists, hopelessness, and feeling that she would never feel better.  (Tr. 1164.)  On examination, Dr. Shulga observed a constricted affect, nonspontaneous speech, depressed mood, evasive thought process/content, limited judgment and insight, no hallucinations, and suicidal ideation with a plan and intent.  (*Id*.)  She concluded that Ms. Beulah was at substantial risk for suicide and would benefit from inpatient care, and processed an application for emergency hospitalization.  (Tr. 1165.)

Ms. Beulah was thereafter then taken to University Hospital (UH) where she was seen by attending emergency room physician Stephanie LeAnn Gaines, M.D.  (Tr. 1489-91.)  Dr. Gaines noted that Ms. Beulah had a history of depression and possible bipolar disorder and was being seen for worsening depression with suicidal ideation and a plan to cut her wrists.  (Tr. 1490.)  Following a psychiatric assessment, it was determined that Ms. Beulah met the criteria for inpatient admission.  (Tr. 1490.)  Final psychiatric diagnoses on admission were suicidal ideation with intent, audiovisual hallucinations, known depression, and intermittent homicidal ideation.  (Tr. 1491.)  There do not appear to be further treatment records relating to the August 24, 2015 hospitalization in the record, nor are such records cited by the parties.

During a gynecological visit with Marc Snelson, M.D., at University Hospitals MacDonald Womens Hosp OB/GYN-Richmond on September 23, 2015, Ms. Beulah reported feeling down, depressed, hopeless, and having little interest or pleasure in doing things for the past two weeks.  (Tr. 1456.)  She also reported that she had been hospitalized for her depression, but she was doing better and feeling improved following changes to her medications, including the addition of lithium.  (Tr. 1456, 1460.)

Ms. Beulah returned to Dr. Shulga on October 15, 2015, reporting that she was doing "well" – she denied depression and reported her sleep was good with Trazadone.  (Tr. 1170.)  On examination, she was easily irritated when her needs were not met, but her mood was "pretty good," her speech was clear and distinct, her thought processes and content were coherent, there were no delusions or thoughts of self-harm, and her judgment and insight were adequate.  (*Id.*)  She reported taking her lithium regularly.  (*Id.*)  Prozac and Abilify were discontinued.  (Tr. 1171.)

Ms. Beulah returned to Murtis Taylor on November 30, 2015 for a pharmacological management visit with Registered Nurse Raphaelle Woods.  (Tr. 1173.)  She reported that her appetite and sleep were good, and her mood was stable.  (Tr. 1175.)

Ms. Beulah had a pharmacological visit at Murtis Taylor on February 3, 2016 and was seen by both Nurse Woods (Tr. 1501-05) and psychiatrist Gary Wilkes, M.D. (Tr. 1506-11).  She reported that she had been compliant with her medications and she felt they were helping, but reported problems sleeping.  (Tr. 1508.)  She indicated she planned to talk to her primary care physician about an adjustment to the Trazadone being prescribed for her sleep.  (*Id.*)  On examination, her affect was fluid, her speech was soft, her mood was euthymic, her thought processes and content were coherent, there were no hallucinations, delusions, or

9

suicidal/homicidal ideation, and her judgment and insight were fair.  (*Id*.)  Dr. Wilkes noted

compliance with medication (Tr. 1508), and instructed Ms. Beulah to get lab work and continue

with the present treatment (Tr. 1509).  Ms. Beulah's next visit was to occur in eight weeks.  (Tr.

1510.)  It appears from the record that Ms. Beulah continued treatment with Murtis Taylor

through May 2016 but there do not appear to be Murtis Taylor records in evidence between the

February 3, 2016 visit and May 2016.  (Tr. 1960, 1966.)

       While Ms. Beulah did not return to Murtis Taylor after May 2016, she started to receive

mental health services at Signature Health, Inc. fka Connections: Health Wellness

("Connections") on August 2, 2016, presenting for a metal health assessment that was completed

by Registered Nurse Rochelle Walzman.  (Tr. 1957; *see also* Tr. 2989 (reflecting Connections

was the predecessor to Signature Health, Inc.).)  She complained of being depressed and anxious

for a long time and hearing voices since she was fourteen years old.  (*Id*.)  She reported living

with two of her daughters and three grandchildren.  (*Id*.)  She reported problems sleeping, but

said she did not take sleeping pills because she looked after her five-month-old grandson with

the help of her teenage grandson.  (Tr. 1966.)  But she also relayed that when her five-month-old

grandson cried, it caused her to have thoughts of hurting him which disturbed her, and she was

trying to find another place to live.  (Tr. 1957.)  Nurse Walzman provided the following mental

status examination summary: "Alert/oriented x 3.  Extreme mood swings.  Anger issues.  Daily

thoughts of suicide.  Still cuts since age 12.  Extreme paranoid thoughts.  Prefers to be alone."

(Tr. 1965.)  Ms. Beulah's provisional diagnoses were schizoaffective disorder, depressive type

and panic disorder and she was referred for a psychiatric evaluation for pharmacological

management of her conditions, community psychiatric supportive treatment (CPST), and

counseling.  (Tr. 1966-67.)

10

On August 18, 2016, Ms. Beulah saw Tiffany Jones, M.D., for a psychiatric evaluation. (Tr. 1969-1973.)  She reported being depressed every day, indicating her depression was worse when she was off her medication.  (Tr. 1969.)  Except for findings of a depressed mood and "affect mood congruent," mental status examination findings were normal.  (Tr. 1970-71.)  Ms. Beulah's diagnoses were: severe bipolar disorder, current or most recent episode depressed, severe without psychotic features; post-traumatic stress disorder, unspecified; generalized anxiety disorder; and alcohol abuse, uncomplicated, sustained, full.  (Tr. 1972-73.)  Dr. Jones prescribed lithium carbonate 600 mg, gabapentin 100 mg, and quetiapine 300 mg, and instructed Ms. Beulah to return in one month. (Tr. 1971.)

Along with seeing Dr. Jones, Ms. Beulah received CPST services through Connections from September 2016 through November 2017, usually seeing or communicating with Adam Weston or India Burris on a bi-monthly basis.  (Tr. 1974-75, 1976-77, 1978-79, 2080-81, 2083-84, 2086-87, 2088-89, 2090-91, 2785-86, 2787-88, 2789-90, 2792-93, 2794-95, 2796, 2852-53, 2854-55, 2856, 2866, 2872, 2873, 2989.)

Ms. Beulah returned to Dr. Jones on October 20, 2016, reporting that she had been sleeping well on her medications, but also that she had not had medications for one month and was feeling more depressed and irritable since being off lithium. (Tr. 2096.)   Dr. Jones restarted her on the following medications: lithium carbonate 600 mg, gabapentin 300 mg, and quetiapine 300 mg.  (Tr. 2097.)

During separate visits with Dr. Jones and Adam Weston on December 2, 2016, Ms. Beulah reported being depressed and tired of dealing with her physical pain and stressors. (Tr. 2087, 2099.)  She reported writing a suicide note, but said she did not plan to follow through though because she did not want her grandchildren to find her.  (*Id*.)  Dr. Jones pink slipped her

for medication management and safety precautions.  (Tr. 2099.)  She was transported to University Hospitals for a psychiatric admission, where she reported feeling suicidal every day and being noncompliant with her medications.  (Tr. 2003, 2008.)  On examination, her mood and affect were appropriate.  (Tr. 2004.)  During her admission, her Seroquel was increased to 350 mg and her lithium was increased to 450 mg twice each day.  (Tr. 2008.)  She was discharged on December 7, 2016 with final diagnoses of bipolar disorder and major depressive disorder severe episode with psychoses.  (*Id*.)

Following her discharge, Ms. Beulah saw Dr. Jones on December 14, 2016, appearing to have an improved mood, reporting better sleep, and admitting to medication noncompliance prior to her recent hospitalization.  (Tr. 2103.)  Mental status examination findings were normal, including a euthymic mood and no suicidal ideas, intent, or plan.  (Tr. 2104.)  Dr. Jones continued Ms. Beulah's Seroquel at 300 mg and her lithium at 450 mg, and indicated she should return in two months.  (Tr. 2103, 2105.)

Ms. Beulah next saw Dr. Jones on April 4, 2017.  (Tr. 2808.)  She had her one-year-old grandson with her and reported stressors of her lupus and financial situation.  (*Id*.)  She reported better sleep and a good appetite, but also reported occasional suicidal ideation as well as a depressed mood and irritability.  (*Id*.)  She also reported not taking her Seroquel due to having paranoia regarding sleeping too long at night.  (*Id*.)  Except for a depressed and irritable mood and dysphoric affect, mental examination findings were normal.  (Tr. 2809-10.)  Dr. Jones discontinued Seroquel and started Ms. Beulah on Latuda 40 mg, and instructed her to return in a month.  (Tr. 2808, 2810.)

Ms. Beulah returned to see Dr. Jones one month later, on May 4, 2017.  (Tr. 2874.)  She reported that she would be moving into a new apartment the following month and would be

living alone.  (*Id.*)  She reported an improved mood, better sleep, good appetite, less paranoia, and indicated her last suicidal ideation was one week earlier with no intent or plan.  (*Id.*)  She indicated she was continuing to watch her one-year-old grandson and was paid by her daughter for doing so.  (*Id.*)  Mental status examination findings were normal, and Dr. Jones continued the same medication regimen.  (Tr. 2874-75.)

Although instructed to return in two months (Tr. 2874), Ms. Beulah did not return to see Dr. Jones until November 8, 2017 (Tr. 2995).  At that visit, she reported that Latuda had helped with her mood but not her sleep.  (*Id.*)  She reported that her mood swings were worse when off her medication, and stated she had been burning her legs and arms with cigarettes since June.  (*Id.*)  She stated: "I'm trying to get my affairs in order," but denied access to a gun and indicated she had been attending church and was speaking with church members, which was helping.  (*Id.*)  She also described homicidal ideation towards anyone who upset her. (*Id.*)  Dr. Jones restarted her on lithium 450 mg twice each day and Seroquel 300 mg, and directed her to return in one month. (Tr. 2997, 3001).  Ms. Beulah did not return for treatment as instructed and her case with Connections was closed on February 12, 2018 after she did not return for treatment and did not respond to outreach attempts. (Tr. 2989-2990.)

Ms. Beulah did resume treatment at Murtis Taylor on February 15, 2018, when she presented for a psychiatric diagnostic examination, seeking pharmacological management, counseling and case management services.  (Tr. 3049.)  She was examined by Clover English, III, LISW.  (Tr. 3049-61.)  She reported dissatisfaction with her prior medications and treatment, and appeared motivated "to seek treatment so as to get [her] [mental health] symptoms to be at their lowest problem level."  (Tr. 3059.)

The following month, Ms. Beulah saw psychiatrist Saroj Brar, M.D. at Murtis Taylor on March 9, 2018 for an examination.  (Tr. 3062-74.)  The following complaints/problems were noted: depressed mood, anxiety, trouble sleeping, mood swings, hallucinations, and being off medication since November 2016.  (Tr. 3065.)  This report appears to conflict with records evidencing her treatment with medication in 2017.  On examination, she was well groomed, her eye contact and activity were average, her speech was clear, there were no reported delusions, she reported a history of audio hallucinations, her thought process was logical, her mood was depressed and anxious, she had a full affect, her behavior was cooperative but with loss of interests and withdrawn, and her insight and judgment were fair.  (Tr. 3066-67.)  Dr. Brar noted that it was not clear whether Ms. Beulah's conditions were responsive to treatment because she had not been in regular treatment and she still smoked marijuana.  (Tr. 3073.)  Ms. Beulah was diagnosed with: schizoaffective disorder; cannabis use disorder, moderate; and borderline personality disorder.  (Tr. 3068-69.)  Dr. Brar noted that Ms. Beulah's current medications included lithium carbonate 600 mg and quetiapine 200 mg. (Tr. 3069-70.)

Ms. Beulah returned to see Dr. Brar on May 4, 2018 for medication management.  (Tr. 3131.)  She reported symptoms of depression, irritability, and problems sleeping, but no paranoia and no mood swings.  (*Id*.)  Dr. Brar prescribed Effexor XR 75 mg, lithium carbonate 300 mg twice a day, and Seroquel 50 mg.  (Tr. 3132-33.)

Ms. Beulah returned to Murtis Taylor on August 30, 2018, ambulating with a walker, with a grossly constricted affect. (Tr. 3119-29.)  She reported to Mary Harrison, APRN, NPC that she did not feel that her medications were helping, and that Effexor made her sick.  (Tr. 3120.)  She reported being "somewhat irritable" with "poor frustration tolerance," and indicated "the only medicine that worked" was "Elavil (unknown dose) + Seroquel 300 mg."  (*Id*.)  On

examination, Ms. Beulah's insight and judgment were fair, but NP Harrison noted that Ms. Beulah "[w]ant[ed] to take medication [the] way she wants to, not as prescribed then c/o 'it not working.'" (Tr. 3125.)  NP Harrison concluded: "patient presenting with unresolved mood issues partly due to noncompliance and in my estimation, not an adequate mood stabilizing dose." (Tr. 3126.)  She discontinued Effexor, started Elavil 50 mg and increased Seroquel to 300 mg.  (Tr. 3124, 3126.)

Ms. Beulah saw NP Harrison on September 27, 2018 for follow up.  (Tr. 3109.)  NP Harrison noted that Ms. Beulah presented as much calmer, and without irritability or poor frustration tolerance.  (*Id*.)  She did not complain of depression and her mood appeared more stable.  (*Id*.)  She reported good results from the medication adjustments made the prior month, but expressed her hope that "her mood could be more stable especially during the day along with more pain relief during the day."  (*Id*.)  NP Harrison reinitiated gabapentin 400 mg three times a day and continued Seroquel 300 mg and Elavil (amitriptyline) 50 mg.  (Tr. 3113-14, 3115.)

In October 2018, NP Harrison noted that Ms. Beulah's judgment and insight were fair but also "hard to assess."  (Tr. 3100.)  She noted Ms. Beulah "initially stat[ed] her mood is still unstable and then stat[ed] it is not unstable? 'my mood is so so.'"  (*Id*.)  Ms. Beulah reported that she felt the gabapentin dose was not enough.  (Tr. 3098.)  NP Harrison increased the gabapentin (Neurontin) dose to 600 mg and continued the other medications at the same dose.  (Tr. 3103, 3104.)

In November 2018, Ms. Beulah reported to NP Harrison that she was medication compliant.  (Tr. 3086.)  She reported that her mood was good, and her pain was under control but the gabapentin was causing an upset stomach.  (Tr. 3087.)  She was feeling stressed about her financial situation and had given thought to getting arrested so she could go to jail.  (*Id*.)  On

15

examination, NP Harrison observed a constricted affect, noting that Ms. Beulah commented "but that's always the way I look." (Tr. 3089.) NP Harrison adjusted the gabapentin prescription from 600 mg three times per day to 300 mg, one to two pills three times per day as needed for anxiety or pain. (Tr. 3088.)

Ms. Beulah saw Dr. Brar on February 26, 2019. (Tr. 3075-85.) She reported being medication compliant and denied side effects. (Tr. 3075, 3081.) Her insight and judgment were fair, and her mental examination findings were normal or good. (Tr. 3077-78.) Dr. Brar's assessment stated that Ms. Beulah was: "stable. No evidence of mania now and in the past. [H]er symptoms are depression." (Tr. 3083.) Lexapro 10 mg was added to Ms. Beulah's medications. (Tr. 3156.)

Ms. Beulah returned to Murtis Taylor on April 16, 2019 and saw Denise Crawford, APN. (Tr. 3155.) She reported she had not had her medications and was manic, sleeping only two hours, and having auditory commanding hallucinations but she was not acting on the commands. (Tr. 3156.) On examination, her speech was pressured, she reported homicidal and suicidal ideation, very poor memory, and unstable mood. (Tr. 3158.) She also reported attention and concentration problems due to having a stroke when she was forty-four years old, with memory problems, and a mood described as "up and down." (*Id*.) She reported side effects from the Lexapro of upset stomach and diarrhea, so Nurse Crawford changed Lexapro to Celexa 20 mg for anxiety and depression. (Tr. 3164.)

Ms. Beulah saw Nurse Crawford again on June 14, 2019. (Tr. 3145.) She reported symptoms of depression and lack of energy. (*Id*.) She continued to report visual hallucinations and commanding audio hallucinations and up and down mood swings. (Tr. 3147.) Memory problems were noted as well as poor judgment and insight. (*Id*.) Ms. Beulah was diagnosed

16

with mood disorder not otherwise specified with multiple medical conditions.  (Tr. 3152.)  Nurse

Crawford discontinued Celexa because Ms. Beulah's primary care physician had prescribed

Cymbalta for pain.  (*Id*.)

### ii.        Physical Health Treatment History

Ms. Beulah saw Harigopal Balaji, M.D. of Faith Medical Center as a new patient on July

9, 2014. (Tr. 479-82, 1390, 1393-96.)  She reported a recent hospitalization for chest pain,

relaying that she had being doing okay since her discharge.  (Tr. 479.)  She complained of

painful thick skin on the bottoms of her feet and pain in her joints, knees, ankles, shoulder blades

and lower back and reported that taking Tylenol 3 was not really helping.  (*Id*.)  On examination,

she displayed full range of motion in the neck, with no clubbing, cyanosis, or edema in the

extremities, normal motor strength, and intact sensory exam.  (Tr. 481.)  Ms. Beulah's diagnoses

included generalized osteoarthritis and systemic lupus erythematosus ("SLE").  (*Id*.)  Dr. Balaji

ordered x-rays of the right knee and hip for her osteoarthritis, and referred her to see a

rheumatologist for her SLE.  (Tr. 482, 487-88.)

On July 24, 2014, Ms. Beulah saw Mona Reed, M.D., also at Faith Medical Center,

complaining of shortness of breath, chest pain, ankle edema, and fair energy.  (Tr. 483.)

Examination findings were generally normal.  (Tr. 484.)  Ms. Beulah saw Dr. Balaji again on

August 6, 2014, stating she felt well but had not yet had the x-rays taken and had not seen the

rheumatologist.  (Tr. 485.)

Ms. Beulah saw Dr. Wagner at CAHC in October 2014 for a routine follow-up and

complained that her joints were "on fire," indicating that it was her right knee that day, she had

crepitus, it hurt, and stairs were "not her friend."  (Tr. 521.)  She reported feeling like she was

having a "lupus flare" due to stress.  (*Id*.)  An examination showed some right knee joint

enlargement with crepitus.  (Tr. 522.)  Dr. Wagner assessed possible osteoarthritis in the right

knee, indicating that they would confirm with an x-ray and could consider a knee injection if the

problem persisted.  (*Id*.)  During a visit with Dr. Wagner the following month, Ms. Beulah

reported doing okay.  (Tr. 519.)  Dr. Wagner noted however, that he had been unable to obtain

prior medical records, so he referred her to rheumatology to confirm a diagnosis of rheumatoid

arthritis.  (Tr. 520.)

On January 9, 2015, Ms. Beulah saw Dr. Reed, complaining of intermittent lower

extremity edema in her ankles, as well as dizziness/lightheadedness.  (Tr. 1403-05.)  Dr. Reed

observed trace edema bilaterally in Ms. Beulah's ankles and calves, but no musculoskeletal

swelling, deformity, effusions, or atrophy and normal strength and sensation.  (Tr. 1404.)

Ms. Beulah saw rheumatologist Irfan Raheem, M.D. for an evaluation on January 19,

2015.  (Tr. 1406.).  Based on his evaluation, Dr. Raheem felt that Ms. Beulah had characteristics

of inflammatory arthritis and ordered lab work and x-rays to assess the condition.  (*Id*.)  He also

recommended a physical therapy consultation.  (*Id*.)  X-rays of Ms. Beulah's knees and pelvis

were taken on January 19, 2015.  (Tr. 1482-84.)  The right knee x-ray was unremarkable, but the

pelvic x-ray showed mild left hip osteoarthritis.  (*Id*.)

Ms. Beulah saw Dr. Balaji on March 4, 2015, with a chief complaint of lower back and

leg pain.  (Tr. 1406.)  Examination findings were unremarkable.  (Tr. 1407-08.)  Dr. Balaji

started Ms. Beulah on Tramadol 50 mg every six hours as needed to treat her SLE.  (Tr. 1408.)

Ms. Beulah returned to see Dr. Balaji on May 4, 2015, complaining of pain and

requesting a refill of Tramadol. (Tr. 1412.)  She reported that her SLE and osteoarthritis were

stable.  (*Id*.)  Examination findings were unremarkable.  (Tr. 1413.)  She was continued on

Tramadol for generalized osteoarthritis and had a rheumatology appointment for SLE.  (*Id*.)

18

Ms. Beulah saw Dr. Reed for a follow up on July 2, 2015.  (Tr. 1415.)  She complained of moderate hypertension and joint pain located in her legs that was moderate in severity and had started months ago.  (*Id*.)  Ms. Beulah was diagnosed with atherosclerosis of native arteries of the extremities with intermittent claudication.  (Tr. 1417.)  Dr. Reed provided counseling on nutrition and physical activity, and recommended that Ms. Beulah walk thirty minutes each day and undergo vascular testing.  (Tr. 1417, 1472-76.)

On July 23, 2015, Ms. Beulah saw Dr. Balaji, complaining of right leg pain when walking and right leg numbness and tingling.  (Tr. 1418.)  Her hypertension, asthma, and generalized osteoarthritis were noted to be stable.  (Tr. 1418, 1419-20.)  Examination findings were unremarkable.  (Tr. 1419.)  Dr. Balaji ordered a lumbar spine x-ray relative to the right leg numbness.  (Tr. 1420.)  The x-ray showed no degenerative changes of the lumbar spine, but there was evidence of moderate bilateral hip osteoarthritis.  (Tr. 1023.)

During a visit on September 23, 2015 with her gynecologist Dr. Snelson, Ms. Beulah reported a fear of falling and was using a cane for assistance.  (Tr. 1456.)  Ms. Beulah saw Dr. Balaji a few days later, complaining of left shoulder pain with decreased range of motion after falling in her bathtub in August. (Tr. 1421.)  Examination findings were unremarkable.  (Tr. 1422.)  Dr. Balaji noted that Ms. Beulah's hypertension and generalized osteoarthritis were stable, but indicated she had bald patches on her scalp related to her SLE and referred her to rheumatology.  (Tr. 1421, 1422-23.)  He refilled Tramadol for the shoulder pain and ordered a shoulder MRI.  (Tr. 1422-23.)  The shoulder MRI completed on October 23, 2015 showed no acute fracture or dislocation, but with mild degenerative-type fibrillation of the superior glenoid labrum. (Tr. 1478.)

19

Ms. Beulah returned to see Dr. Reed for follow up regarding her hyperlipidemia and hypertension on November 6, 2015.  (Tr. 1427.)  She complained of chest pain, dizziness, headache, hypertension, shortness of breath, palpitations, and lower extremity edema located in the ankles bilaterally. (*Id*.)  On examination, dorsalis pedalis and posterior tibial peripheral pulses were 1 + bilaterally but there was no edema in the extremities and a foot examination showed normal strength and sensation.  (Tr. 1428-29).  Dr. Reed counseled Ms. Beulah on nutrition and exercise.  (Tr. 1429.)

Ms. Beulah saw Dr. Raheem for a rheumatology follow up on December 21, 2015. (Tr. 1492-95).   She reported morning stiffness of more than one-hour, increased fatigue and weakness, sensitivity to the sun, alopecia areata, dry eyes and dry mouth, and significant joint pain especially in her hands, knees, and ankles, and swelling that was getting progressively worse over the past few weeks. (Tr. 1492.)   On examination, Dr. Raheem observed limited range of motion in her shoulders that was greater on the left than right and bilateral synovitis in her hands and knees. (Tr. 1494.)  Dr. Raheem diagnosed a SLE flare.  (Tr. 1495.)  He commented that Ms. Beulah had not been on medication to manage her SLE, noting that she had stopped hydroxychloroquine because of insurance issues.  (*Id*.)  Dr. Raheem started her on a Medrol dose pack and hydroxychloroquine 200 mg twice each day.  (Tr. 1495.)

On December 28, 2015, Ms. Beulah received emergency room treatment after falling down three steps while slipping on the ice.  (Tr. 1247, 1251.)  She reported landing on concrete and hitting her head but did not lose consciousness and denied dizziness, numbness, tingling, neck pain, or headache but reported left-sided back pain.  (*Id*.)  On examination, she displayed left low back and rib tenderness to palpation.  (Tr. 1252.)   She was diagnosed with low back pain secondary to fall, and prescribed one Percocet and 600 mg of Motrin.  (Tr. 1253.)  A CT

scan of the lumbar spine showed no acute fracture of traumatic subluxation of the lumbar spine, but evidence of bilateral sacroiliac osteoarthrosis.  (Tr. 1238.)

Ms. Beulah complained of hypertension, fatigue, shortness of breath, lower extremity edema in her legs and ankles and pain, cramping in her legs with walking two blocks, and pain and stiffness in her joints when she saw Dr. Reed on January 8, 2016.  (Tr. 1434-35.) Examination again revealed weak peripheral pulses in both of Ms. Beulah's lower extremities. (Tr. 1435.)  Dr. Reed continued to counsel Ms. Beulah on nutrition and exercise.  (Tr. 1436.)

Ms. Beulah saw Al-Amin Khalil, M.D. of University Hospitals for pain management in October 2016.  (Tr. 1984-89.)  She complained of pain throughout her body, secondary to lupus, which she described as aching, burning, or stabbing in nature and rated as 10/10.  (Tr. 1984.) She reported that the pain sometimes radiated from her lower back into her legs, which improved with getting up and moving about and worsened with staying still for too long.  (*Id*.)  She reported numbness and tingling in her arms and legs and motor weakness in her lower extremities.  (*Id*.)  She reported taking gabapentin and Tramadol for pain and said she had tried physical therapy, but complained that her pain was not improved despite conservative treatment of medication and exercise.  (*Id*.)  Dr. Khalil's examination showed a grossly normal gait, tenderness to palpation at more than seven points throughout the upper/lower extremities and upper/lower back.  (Tr. 1987.)  She displayed normal muscle and motor strength, normal reflexes, and normal provocative tests, but decreased sensation to temperature in her upper and lower extremities.  (*Id*.)   Dr. Khalil diagnosed SLE arthritis and inflammatory arthritis.  (*Id*.)  He noted that the decreased sensation to temperature in the extremities might signify a component of neuropathy.  (*Id*.)  Ms. Beulah was scheduled for ketamine infusion, referred to aquatic therapy,

prescribed a TENS unit, and her gabapentin was increased from 100 mg once per day to 100 mg twice per day.  (Tr. 1987-88.)

On November 17, 2016, Ms. Beulah attempted to receive a ketamine infusion for treatment of lupus arthritis and multiple joints pain. (Tr. 2005-06).  The dosage was reduced after she became agitated, and then the infusion was discontinued after she experienced three episodes of hypertension.  (Tr. 2006.)  At the conclusion of the infusion, Ms. Beulah's pain level was reduced from 10/10 to 8/10.  (*Id.*)

Ms. Beulah had another pain management visit on December 19, 2016 with Fady Nageeb, M.D. at The Cleveland Clinic's Pain Management Center at Euclid Hospital for treatment of her chronic pain/lupus. (Tr. 2628-31).  She described her pain as aching and constant and rated her pain on a scale of 0-10 as a 10 on her worst day and a 3 on her best day. (Tr. 2629.)  She reported that her pain was persistent and aggravated with activity, and relieved with standing, resting, and medication like Tramadol.  (*Id.*)  She reported getting five hours of uninterrupted sleep each night and feeling unrested in the morning.  (*Id.*)  On examination, Dr. Nageeb observed positive facet loading in the lumbar spine.  (Tr. 2630.)  Otherwise, examination findings were unremarkable.  (*Id.*)  Dr. Nageeb diagnosed lumbosacral spondylosis without myelopathy and multiple joint pain, noting her pain interfered with her daily activities including standing and bending. (*Id.*)  Dr. Nageeb recommended bilateral lumbar facet injections.  (*Id.*)

On December 19, 2016, Ms. Beulah saw Michael Madonna, M.D. in the internal medicine department at the Cleveland Clinic.  (Tr. 2039.)  Dr. Madonna noted that there were no records in their system since most of Ms. Beulah's care had been through University Hospitals for the past few years.  (*Id.*)  Ms. Beulah reported taking Plaquenil for her SLE.  (*Id.*)  Examination showed no lower extremity deformities, edema, or skin discoloration, and

22

peripheral pulses of 2+, but with left-sided weakness in the upper and lower extremities, greater in the lower extremities, and left facial nerve palsy. (Tr. 2041.)  Dr. Madonna continued Ms. Beulah on Plaquenil and referred her for rheumatologic and ophthalmologic consults.  *Id.*

In January 2017, Dr. Nageeb administered lumbar medial branch nerve blocks at L3/4, L4/5 and L5DR bilaterally for low back pain that radiated into her thigh.  (Tr. 2623-24.)

On April 10, 2017, Ms. Beulah returned to the Cleveland Clinic's pain management clinic.  (Tr. 2599.)  She saw Paul Gawry, PA-C, and reported generalized body pain.  (*Id.*)  She described her pain as burning and throbbing, with current pain of 9/10, and exacerbating factors that included "just getting up sometimes," and alleviating factors that included resting, Epsom salt baths, and celestial tea.  (Tr. 2600.)  She reported associated symptoms of headache and nausea.  (*Id.*)  On examination, PA Gawry observed mild pain to palpation in the lumbar spine over the midline and paraspinal muscles, limited flexion and extension with induced facet loading.  (Tr. 2601.)  PA Gawry also noted an impaired gait and use of a walker, but reflexes were 2+ and symmetric, motor and sensory were normal, and straight leg raise test was negative. (*Id.*)  Ms. Beulah reported eighty percent back pain relief from her injections that lasted one month.  (*Id.*)  Repeat lumbar facet joint injections were ordered.  (*Id.*)

In April 2017, Ms. Beulah was also evaluated by a rheumatologist at the Cleveland Clinic for her lupus, due to changing providers from University Hospitals. (Tr. 2587-90). She saw Carmen Gota, M.D.  (Tr. 2587.)  Examination showed normal neck and musculoskeletal range of motion but generalized tenderness on musculoskeletal examination.  (Tr. 2589.)  Dr. Gota made some adjustments to Ms. Beulah's medications and provided her an order for physical therapy. (Tr. 2599.)  X-rays taken in April 2017 of Ms. Beulah's hips and knees showed mild bilateral hip joint degenerative changes with SI joint degenerative changes greater on the left and mild

23

narrowing of the medial joint compartments of both knees. (Tr. 2650-52.)  Ms. Beulah received additional lumbar facet joint medial branch nerve blocks on May 8, 2017, administered by Dr. Nageeb. (Tr. 2584.)

Dr. Balaji examined Ms. Beulah several times in 2018 and 2019. (Tr. 3030-38.)  At an October 8, 2018, visit, Ms. Beulah was feeling well but also reported pain in multiple joints that was worse with walking and almost constant.  (Tr. 3030.)  Her SLE was noted to be stable.  (*Id*.) Examination findings were unremarkable at the October 2018 visit.  (Tr. 3031.)  Dr. Balaji refilled Ms. Beulah's gabapentin, with 400 mg capsules to be taken four times each day.  (Tr. 3032.)  In December 2018, Ms. Beulah reported to Dr. Balaji that her SLE pain was an 8/10, but that medication helped.  (Tr. 3033.)  Dr. Balaji started her on hydroxychloroquine 200 mg once per day.  (Tr. 3035.)  In January 2019, Dr. Balaji continued Ms. Beulah on gabapentin and hydroxychloroquine at the same dosages for her generalized osteoarthritis and SLE.  (Tr. 3038.) Dr. Balaji also continued Ms. Beulah on methocarbamol (a muscle relaxer) 500 mg once per day for her generalized osteoarthritis.  (*Id*.)

Ms. Beulah saw Jennifer Schibli, PA-C in the internal medicine department at the Cleveland Clinic on May 2, 2019 for complaints of bilateral swelling in her hands and feet that had been occurring for one week.  (Tr. 3180.)  She reported that there was pain associated with the swelling.  (*Id*.)  She reported being compliant with hydroxycholorquine for SLE, as well as taking gabapentin, Flexeril, and tramadol for pain.  (*Id*.)  She relayed that she was currently out of Tramadol.  (*Id*.)  On examination, PA Schibli noted bilateral soft tissue swelling of both hands with nonpitting edema over the metacarpals and wrists along with tenderness to palpation and decreased range of wrist flexion and extension due to pain.  (Tr. 3182.)  There was no pitting edema in the feet and distal pulses were intact in the extremities bilaterally.  (*Id*.)  PA Schibli

suspected a lupus arthritis flare for which she prescribed a short dose of prednisone and placed a rheumatology referral. (*Id*.)

### 2. Opinion Evidence

#### i. Psychological Medical Opinion Evidence

##### a. Treating Source Opinion of Dr. Gary Wilkes, M.D.

On March 14, 2016, Dr. Wilkes completed a form titled "Medical Source Statement: Patient's Mental Capacity" where he rated Ms. Beulah's ability to perform basic mental activities of work on a sustained basis. (Tr. 1497, 1499.) The available rating choices were: "constant," meaning the ability to perform activity is unlimited; "frequent," meaning the ability to perform activity exists for up to two-thirds of the workday; "occasional," meaning the ability to perform activity exists for up to one-third of the workday; and "rare," meaning the activity cannot be performed for any appreciable time. (Tr. 1499.) Dr. Wilkes indicated that Ms. Beulah had been under the care of his practice or facility (Murtis Taylor) for a number of years, and that her diagnoses of anxiety and mood swings supported his assessment regarding her functional abilities. (Tr. 1497.)

Dr. Wilkes opined that Ms. Beulah could *constantly*: understand, remember, and carry out simple job instructions. (Tr. 1497.) Dr. Wilkes opined she could *frequently*: (1) follow work rules; (2) use judgment; (3) understand, remember, and carry out detailed, but not complex job instructions; (4) maintain appearance; (5) socialize; (6) relate predictably in social situations; (7) manage funds/schedules; and (8) leave home on her own. (Tr. 1497, 1499.)

Dr. Wilkes also opined she could *occasionally*: (1) maintain attention and concentration for extended periods of two-hour segments; (2) respond appropriately to changes in routine settings; (3) maintain regular attendance and be punctual within customary tolerance; (4) deal

with the public; (5) relate to coworkers; (6) interact with supervisors; (7) function independently without redirection; (8) work in coordination with or proximity to others without being distracted; (9) work in coordination with or proximity to others without being distracting; (10) understand, remember and carry out complex job instructions; and (11) behave in an emotionally stable manner.  (Tr. 1497, 1499.)  And he opined she could *rarely*: (1) deal with work stress; or (2) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 1499.)

### b.  Treating Source Opinion of Dr. Tiffany Jones, M.D.

On March 21, 2017, Dr. Jones authored a "To whom it may concern" letter, stating that Ms. Beulah was receiving treatment at Connections "for severe and persistent mental health diagnosis that prevent her from maintaining employment."  (Tr. 2465.)  Dr. Jones explained that Ms. Beulah's "diagnosis of Bi-polar I Disorder, Post-Traumatic Stress Disorder and Generalized Anxiety prevent her from reliably performing tasks, engaging with others in community setting appropriately, and maintaining reliable attendance." (*Id*.)  She further stated: "This in combination with medical conditions deem her disabled and unable to continue gainful employment." (*Id*.)

### c.  Consultative Examiner

On August 27, 2014, Licensed Psychologist Natalie M. Whitlow, Ph.D. conducted a psychological evaluation.  (Tr. 502-10.)  Ms. Beulah reported applying for disability benefits due to mental and physical health issues.  (Tr. 503.)  She reported she was compliant with taking risperidone and Prozac for mood stabilization and depression as prescribed.  (Tr. 504.)  She

denied having a history of attendance problems at work, but reported having a history of behavioral problems at work.  (Tr. 505.)

On mental status examination, Dr. Whitlow observed that Ms. Beulah's attire was appropriate, and her hygiene was attended to.  (Tr. 505.)  She noted that Ms. Beulah periodically "stared off" and had a "dazed look."  (*Id*.)  She also noted that Ms. Beulah immediately started talking and sharing information that was unsolicited when she arrived in the office, but that Ms. Beulah's behavioral presentation overall was within the normative range of functioning.  (Tr. 506.)  Ms. Beulah's thought processing was observed to be "loose and tangential and she demonstrated difficulty keeping her thought processing on track."  (*Id*.)  Ms. Beulah reported that she was usually anxious and depressed, and Dr. Whitlow observed that her "in-evaluation affect appeared to be slightly elevated."  (*Id*.)  In the mental status portion of her report, Dr. Whitlow noted that she did not observe symptoms of anxiety during the evaluation.  (Tr. 506.)  However, she noted in the summary and conclusions portion of the report that she observed symptoms of anxiety and mania during the interview.  (Tr. 508.)  Dr. Whitlow found Ms. Beulah's cognitive functioning to be average to below average, her insight fair, and her judgment poor.  (Tr. 505-06.)

Ms. Beulah was diagnosed with social anxiety disorder, panic disorder, and bipolar disorder, with anxious distress.  (Tr. 507.)  Dr. Whitlow stated that Ms. Beulah's mental health prognosis was fair "due to the severity level of her symptoms and their impacts on her functioning," and indicated "continued compliance to treatment [for her symptoms] will likely yield an increase in functioning."  (*Id*.)  Dr. Whitlow found Ms. Beulah' self-report was reliable.  (Tr. 507-08.)

Dr. Whitlow offered her general opinions as to Ms. Beulah's abilities and limitations in: understanding, remembering, and carrying out instructions; maintaining attention and concentration, and persistence and pace to perform simple tasks and to perform multi-step tasks; responding appropriately to supervision and to coworkers in a work setting; and responding appropriately to work pressures in a work setting.  (Tr. 509.)  But she noted that she could not "draw accurate conclusions about the claimant's ability to effectively engage in the work setting and to ensure that the work environment will be safe and she can maintain gainful employment." (Tr. 508.)  While she was able to "determine[] that [Ms. Beulah's] symptoms impact[ed] her overall functioning, her work performance, interpersonal functioning,  judgment, and  decision-makings," Dr. Whitlow found that she lacked "sufficient information to determine to what level they impact [Ms. Beulah's] functioning."  (*Id*.)

### d.  State Agency Psychological Consultants

Four state agency psychological consultants offered their opinions as to Ms. Beulah's mental RFC.  On initial consideration of the claim, Jaime Lai, Psy. D. reviewed the file on September 24, 2014, and opined that Ms. Beulah:

- Can understand, remember, and carry out one-to-two step tasks;

- Can perform routine tasks that do not require a rapid or consistent pace in a work setting that does not require adherence to strict time demands or deadlines and she would need occasional flexibility in work shifts and break times when experiencing periods of increased symptoms;

- Will likely have difficulty interacting with the general public on a regular basis and responding appropriately to criticism from others. She would be capable of relating adequately on a superficial basis in a setting that entails infrequent public contact, superficial interaction with coworkers, and no over-the-shoulder supervisor scrutiny; and

- Can perform tasks that are routine and predictable and can adapt to minor changes in the workplace that can be easily explained.

(Tr. 215-16.)   At the reconsideration level, Robyn Hoffman, Ph.D. reviewed the file on January

28, 2015, and reached opinions similar to those of Dr. Lai.  (Tr. 230-31.)

As part of the later filed application that was consolidated following remand, two

additional medical consultants – Courtney Zeune, Psy.D. and Robyn Murry-Hoffman, Ph.D. –

offered their opinions as to Ms. Beulah's mental RFC.  (Tr. 1670-72, 1687-89.)  On August 11,

2017, Dr. Zeune opined that:

> Claimant is able to understand, remember, carry out 3-4 step work tasks. Claimant
> maintains sufficient concentration/persistence for these work tasks. Claimant
> would have difficulty with more detailed tasks and maintaining concentration for
> extended periods of time. Claimant is able to interact with co-workers and
> supervisors on superficial basis. Claimant may have difficulty with jobs requiring
> frequent changes in pace.

(Tr. 1672.)  On November 1, 2017, Dr. Murry-Hoffman adopted the ALJ's May 16, 2016 RFC,

stating that Ms. Beulah could "carry out simple routine tasks and occ superficial social

interactions with routine workplace changes."  (Tr. 1689.)

### ii.    Physical Medical Opinion Evidence

#### a.    Treating Source Opinion of Nicholas Cohen, M.D.

In May 2018, treating physician Nicholas Cohen, M.D. completed a Medical Source

Statement: Patient Physical Capacity.  (Tr. 3007-09.)  Dr. Cohen opined that Ms. Beulah had

significant physical limitations, including the ability to: lift only three pounds occasionally; sit

for no more that forty-five minutes to one-hour at a time; and rarely climb, crouch, crawl, or

push/pull.  (Tr. 3008-09.)  He opined that Ms. Beulah's ability to stand/walk was limited, but did

not provide specific standing/walking limitations.  (Tr. 3008.)  Dr. Cohen indicated that Ms.

Beulah had been prescribed the following devices: cane, walker, brace, TENS unit, and breathing

machine.  (Tr. 3009.)   He opined that Ms. Beulah needed the ability to alternate between sitting,

standing, and walking at will, she would need to elevate her legs at will to forty-five degrees, and

29

she would require unscheduled rest periods beyond the standard workday breaks.  (*Id*.)   He also rated Ms. Beulah's pain as moderate to severe, and opined that her pain would interfere with concentration, take her off task, and cause absenteeism.  (*Id*.)  Dr. Cohen indicated that the opined physical limitations were due to cataracts in both eyes, chronic pain, asthma, fibromyalgia, inflammatory arthritis, and systemic lupus.  (Tr. 3008.)  He also opined that her bipolar disorder, depression, and schizophrenia would interfere with her ability to work eight hours a day, five days a week.  (Tr. 3009.)

### b.    Consultative Examiner

On October 6, 2014, Dorothy A. Bradford, M.D., conducted a consultative examination. (Tr. 512-18.)  Ms. Beulah's chief complaints were lupus and arthritis and she reported having pain in her arms, back, knees and feet, and bald patches on her head.  (Tr. 516.)  Ms. Beulah reported not using a cane and having no problems standing or walking.  (*Id*.)  An examination showed mild facial droop from Bell's Palsy.  (Tr. 517, 518.)  Otherwise, examination findings were normal, and Dr. Bradford opined that there were no activity restrictions.  (Tr. 517-18.)

On November 13, 2017, Dr. Bradford conducted another examination.  (Tr. 2976-82.) Ms. Beulah's chief complaints were lupus, vision problems, and arthritis.  (Tr. 2980.)  She reported taking Plaquenil and seeing pain management but not using an ambulatory aid.  (*Id*.) On examination, Ms. Beulah exhibited mild decreased range of motion in the thorax, back and hips.  (Tr. 2981.)   Otherwise, examination findings were normal, and Dr. Bradford opined that there were "no findings on clinical exam to support a diagnosis of arthritis or vision loss due to SLE.  There are no activity restrictions."  (Tr. 2982.)

### c.    State Agency Medical Consultants

On initial review, state agency medical consultant Diane Manos, M.D. opined on October 9, 2014 that Ms. Beulah had medically determinable impairments but no severe functional limitations.  (Tr. 212.)   On reconsideration, state agency medical consultant Elaine Lewis, M.D. opined on January 21, 2015 that Ms. Beulah had the RFC to perform medium exertional work. (Tr. 229-30.)

As part of the later filed application that was consolidated following remand, two additional medical consultants – Mehr Siddiqui, M.D. and David Knierim, M.D. – offered their opinions as to Ms. Beulah's physical RFC. (Tr. 1668-70, 1685-89.)  They both opined that Ms. Beulah had the RFC to perform light exertional work with the following additional limitations: frequent crouching, crawling, kneeling, and climbing ramps/stairs and occasional stooping and climbing ladders/ropes/scaffolds.  (Tr. 1669, 1686.)

## C.    Testimonial Evidence

### 1.    Plaintiff's Testimony at March 2016 Hearing

Ms. Beulah testified in response to questioning by the ALJ and her representative at the March 18, 2016 hearing.  (Tr. 154-94.)   She explained she was living with one of her daughters, who had recently given birth and undergone major surgery.  (Tr. 155.)  She reported helping with the new baby by making bottles or changing a diaper, but said another daughter came over regularly to help them take care of the house and the newborn.  (Tr. 155, 191-94.)

Ms. Beulah relayed that she does not drive and never had a license because she was too scared to drive.  (Tr. 157, 183.)  She reported relying on her five children and mother for transportation.  (Tr. 157.)  She also reported taking the bus, but explained it is hard for her at times because she does not like crowds.  (Tr. 157-58.)  She testified that there were times when

she lets multiple busses pass the bus stop before gaining the confidence to get on the bus.  (Tr. 183.)  She reported taking the bus to the hearing that day, but noted she had to wake up early to take her lithium to get it in her system before so she could catch the bus.  (Tr. 158.)

Ms. Beulah reported being fired from her last job performing janitorial work in 2012 due to inadequate work performance and calling off work a lot because of her lupus and anxiety.  (Tr. 159-60.)  She also stated she had problems interacting with others at work, including reports that she threatened people at work, although she did not always remember doing it.  (Tr. 176-77, 189-90.)  She also reported losing another job because she had a physical altercation with a coworker that ended with her being escorted off the job site by the police.  (Tr. 179.)

When asked what precluded her from working full time, Ms. Beulah stated that the jobs she knew she could perform from a skill standpoint – restaurant work, factory work, and janitorial work – were too physically demanding because of her arthritis and asthma.  (Tr. 168.)  She reported taking nineteen or twenty different pills every day and some days the pain was so bad she wanted to die, and "you have got little kids that you are trying to help.  It's hard."  (Tr. 168-69.)  She estimated having bad pain days, meaning days when the pain is so bad that she felt like dying, four or five days each week.  (Tr. 186.)  On those days, she reported using a heating pad, taking her medicine, and soaking in Epsom salt.  (*Id*.)  She explained that she had a diagnosis of lupus, with pain in her joints, back, shoulders, and hands, and that her hands would swell up, making it difficult for her to grasp or hold on to things.  (Tr. 169, 187-88.)  She took three different pain medications and steroids.  (*Id*.)  She reported always using a steroid inhaler for her asthma and using a nebulizer up to four times a day since a year or two earlier.  (Tr. 170-72.)  She also reported having an emergency rescue inhaler, which she used when going to the

32

store and daily.  (Tr. 172.)  She reported quitting smoking about two year earlier but acknowledged that she did "cheat" at times by smoking a cigar about every two weeks.  (*Id.*)

Aside from her physical ailments, Ms. Beulah reported that her mental conditions prevented her from working.  (Tr. 169.)  She said it was hard for her emotionally "to work around people.  You know, it is hard to even come out.  It's like a chore even just being in here with people I don't know."  (*Id.*)  She reported being treated for depression, including trying medications that included Elavil, Paxil, Risperdal, and hydroxyzine, with a current prescription of 600 milligrams of lithium.  (Tr. 173, 188-89.)  She reported that there was "no cure" but her treatment was "working for now."  (Tr. 174.)   She indicated she had four psychiatric hospital admissions, and was in the "psych pod" when incarcerated.  (Tr. 190.)  She explained that she received treatment for her mental conditions at Murtis Taylor, including seeing a case manager and counselor twice a month and a therapist once a month.  (Tr. 174.)  She also reported engaging in self-mutilating behavior, explaining "it is like a release, a rush.  It makes me feel better to harm myself."  (Tr. 190-91.)

Ms. Beulah testified that the only people she interacted with were her family, explaining that she never made friends in school and never made friends at work.  (Tr. 174.)   She reported seeing her family daily, but said there were times she needed to explain to her grandkids that she was "having a bad day" because she did not want to hurt them or herself.  (Tr. 175.)  She reported babysitting for her grandchildren if asked, but would let her children know that she could not babysit if asked to do so on a day that she was "mentally not capable" of doing so.  (Tr. 178.)   She expressed gratitude for her brother who assisted her in getting help for her mental conditions after she "literally tried to kill" her oldest daughter years ago, when experiencing hallucinations that caused her to see her daughter as a demon.  (Tr. 178, 189.)  She explained that

33

her children "trust [her] enough with the kids now" that she had been able to get help.  (Tr. 178-79.)  She reported that she still continued to hear voices, including voices telling her to harm herself and others.  (Tr. 189.)

Ms. Beulah reported that her youngest daughter went shopping for her and did the laundry and cleaning at the house.  (Tr. 179.)  She reported cooking occasionally, but that her daughter would also do the cooking when she was there to do the laundry or clean.  (*Id*.)  She reported using a cane prescribed by Dr. Wagner every day, but could not recall when she started using it.  (Tr. 184.)  She estimated being able to walk about twenty minutes with her cane before needing to stop.  (Tr. 185.)   Except for attending doctor appointments or other necessary appointments, Ms. Beulah reported staying in her room in her pajamas, and she did not always shower regularly.  (Tr. 179-80.)  She stated her "life consist[ed] of [her] bedroom," explaining that "everything [she] need[s] [is] in there, [her] computer, everything is in [her] bedroom," including a bathroom, snacks, and a microwave.  (Tr. 183-84.)  She reported she did not do anything at all when in a depressed mode, and was trying to work on coping skills with her providers at Murtis Taylor.  (Tr. 180-81.)  She estimated she had between twenty-one and twenty-five bad days, meaning days when she could not function at all each month.  (Tr. 181.)  When she was working at her last job, she reported calling off about three days per week.  (181-82.)   She explained that her multiple medications caused side effects that included dizziness, vision problems, dry mouth, tongue swelling, and sensitivities to the sun and foods.  (Tr. 191.)

### 2.    September 18, 2019 Hearing

#### i.    Plaintiff's Testimony

Ms. Beulah testified in response to questioning by the ALJ and her representative at the September 18, 2019 hearing.  (Tr. 1597-1615.)  Ms. Beulah was fifty-four years old.  (Tr. 1599-

1600.)  She reported that she had been living alone in an apartment for about two years, but her son was coming over daily to help with chores and shopping.  (Tr. 1597-98, 1607-08.)  She said she no longer watched her grandson, who was then three years old, because she had let her daughter know she did not think it was "a good idea anymore."  (Tr. 1598.)  She explained that she told her daughter: "I'd rather tell you that I couldn't than to, to hurt him.  Because of the mood swings."  (Tr. 1599.)  She stated she still goes over to her daughter's home to visit with them.  (*Id.*)  She explained that she never really wanted to be alone with her grandson even when she was living with her daughter because she never felt capable.  (*Id.*)

She stated she still was not driving, and was not working.  (Tr. 1600.)  She also reported that things were worse since the prior hearing.  (Tr. 1604.)  She explained they were trying to find a better medication to treat her mental health conditions, and that her doctors were trying to figure out medication to help her sleep at night, get out of the house, and deal with her depression.  (Tr. 1604-05.)  She reported being unable to sleep without taking a sleep aid and did not sleep very well even with a sleep aid.  (Tr. 1609-10.)  She reported sometimes being up for forty-eight to seventy-two hours, which caused her to become manic.  (Tr. 1610.)  When asked what it meant to be manic, Ms. Beulah explained:

> I be in a manic panic mode.  To be honest and frank, I armed myself thinking that people are trying to come into the house and stuff.  I don't let the little grandkids come over because I have knives planted everywhere in my house.  I'll be up all night, in just a manic mode. . . I just write.  I write and be depressed, just like in the panic/manic mode.  It's hard to explain how you feel at that time.  I can't put it into words for other people to understand how you feel at that time.  Or what are you feeling.

(*Id.*)

Other symptoms that Ms. Beulah reported experiencing included severe anxiety, not wanting to put on clothes and when she does put clothes on, digging into her skin thinking there

35

is "stuff . . . up under [her] skin" when there is nothing there.  (Tr. 1611.)  She stated: "To be like this is embarrassing for me.  I ask myself what happened?  And it seem[s] like as time is progressing nothing is getting better, it's getting worse."  (*Id.*)  She explained that it was really hard not being around her grandson and not being able to help her daughter with him, but that she had "explained to her, I can't.  At times I can't.  And it hurts."  (*Id.*)  She also reported she did not like not being able to get out and work and help provide.  (*Id.*)  She stated: "I don't skip a day thinking where I just want to die. . . The medicine is just a suppressant, it just to take away for a minute."  (Tr. 1612.)

The ALJ inquired as to whether Ms. Beulah had been compliant with attending medical appointments and taking her medication.  (Tr. 1605.)  Ms. Beulah responded: "Yes and no.  Yes and no.  I have missed, due to, I think it was more transportation issue.  They trying to -- my insurance is trying to get me more transportation. . . But I been good with keeping up with, keeping up with stuff."  (*Id.*)  She did acknowledge instances of medication noncompliance, stating that she thought her noncompliance was not related to transportation issues.  (*Id.*)  When asked to further explain why she sometimes did not take her psychiatric medication, she stated:

> I was -- I wanted to cross over.  I figure the longer I'm off, I wanted to die then.  The, uh, the lady came and she got me, I don't know what you call those people.  Not the doctor, but the counselor.  She came and -- . . . Because I called her on the phone and I explained to her how I felt.  So we started working on a new medication that would try and, try and help with a lot of this.  And then a lot of them now at Murtis Taylor they quitting, so now they keep changing over.  I got one, I got a new doctor there.  She's real nice.  So I been sticking with her as of late.  Dr. Crawford.  That's my new doctor. . . So she's been working with me and we're trying to get a system, a coping system, a daily activity -- . . . to be able to get up and to have a buddy system to call.  She said if you have family support to call.  My daughter's been coming over 'cause she's in the medical field.  She comes over and, you know, they help me clean up now and, you know . . . And put on clothes now.

(Tr. 1605-06.)  She stated further:

And you say why.  Why you didn't take -- I didn't want to take the medicine.  I want to be able, it's like, I wanted t[o] let it all out.  Sometimes, I told her, I'm telling the same things I'm saying here, I told Dr. Crawford.  I just want to walk away from it all.  I'm just tired.  I'm tired.

You can't go out, you can't go out.  It's hard to go out.  It's hard to sleep.  And when you do sleep you don't [w]ant to wake up.  So darn if you do, darn if you don't.

I ask myself half the time, why do God keep sparing me every time I try suicide?  Why am I here?

(Tr. 1612.)

With respect to her physical conditions, she reported constant pain due to fibromyalgia and lupus, falling down the stairs because of problems with her vision, and needing to write everything down and put stickers everywhere because of memory problems.  (Tr. 1606-07.)  She indicated that her pain was the most severe in her back, hips, knees, ankles, and foot, and that her pain is worse with extreme temperatures, damp and rainy conditions, and with repetitive motions like gripping things.  (Tr. 1614.)  Ms. Beulah indicated she took Flexeril, gabapentin, and Cymbalta for pain and also had a brace that she put on her wrist.  (Tr. 1614-15.)  She reported not being able to remember numbers, dates, names, and place.  (Tr. 1613.)  She estimated being able to walk about ten or fifteen minutes before needing to stop to take a break, and being able to sit about thirty minutes before needing to get up and stretch or walk around.  (*Id*.)  She estimated she could lift about five pounds, noting that she recently had tried to pick up her three-year-old-grandson and was not able to.  (Tr. 1613-14.)

As far as activities of daily living, Ms. Beulah reported that her adult son did most of her chores for her, including cleaning and shopping, and that her daughter did the laundry for her.  (Tr. 1607-08.)  She stated: "I spend 99.9 percent of the time in the bedroom, in my room."  (Tr. 1608.)  She explained that she would lay in bed in her pajamas and listen to the television.  (*Id*.)

She reported staying in touch with family members, stating: "The kids are my rock."  (*Id*.)  She also reported interacting with her mother, who visited with her, bought her clothes, and brought food over.  (Tr. 1609.)  When her mother visited, they had coffee together.  (*Id*.)  She also reported visiting with her grandchildren, and said one grandchild who was nineteen years old would come over to help.  (*Id*.)  She described her grandchildren as "little motivational speakers" who gave her pep talks.  (*Id*.)

### ii.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing September 18, 2019 hearing.  (Tr. 1615-21.)   With there being no new employment since the 2016 hearing, the ALJ indicated that the following two unskilled, light exertional jobs would be considered past relevant work based on the testimony from the prior hearing: cashier 2 and housekeeping cleaner.  (Tr. 1601-03.)  The ALJ asked the VE whether there would be work available for an individual described in the below hypothetical:

> [A]n individual claimant's age, education and work experience and if you can please assume that this individual can perform the full range of light work with the following additional limitations.
>
> He or she can frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds.  Occasionally stoop.  Frequently kneel, crouch and crawl.
>
> This individual is also limited to perform simple, routine tasks but not at a production rate pace.  Have occasional interactions with supervisors, coworkers and the public.  And is also limited to routine workplace changes.

(Tr. 1618-19.)  The VE testified that the described individual would be able to perform Ms. Beulah's past housekeeping cleaner job as generally performed not as actually performed and she would be able to perform other work including garment sorter, classifier – laundry sorting position, and marker. (Tr. 1619.)

The VE testified that employers would generally tolerate one absence per month, so there would be no work the individual could perform if she would be absent one or more day per month on a regular basis.  (Tr. 1620.)  The VE testified that employers will generally tolerate a maximum off task rate of no more than ten percent.  (*Id*.)  The VE also testified that there would be no work available if an individual was limited to:

> occasionally lifting 3 pounds but no frequent lifting; could stand or walk two hours out of an eight hour day and sit six hours out of an eight hour day.  Who can occasionally balance, reach, and perform fine and gross manipulation but could not climb ladders, ropes, scaffolds or stairs or ramps, crouch, crawl or push or pull.

(Tr. 1620-21.)  The VE further testified that work would remain unavailable if there were no manipulative limitations, explaining that even at the sedentary level there is at least a five-pound requirement.  (Tr. 1521.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her November 14, 2019, decision the ALJ made the following findings:[2]

---

[2] The ALJ's findings are summarized.

40

1.      The claimant has not engaged in substantial gainful activity since May 30, 2014, the application date.  (Tr. 1524.)

2.      The claimant has the following severe impairments: systemic lupus erythematosus (SLE); osteoarthritis and allied disorders; obesity; depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorder.  (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 1525-26.)

4.      The claimant has the residual functional capacity to perform light work except she can frequently climb ramps/stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; frequently kneel/crouch/crawl; limited to performing simple routine tasks, but not at a production rate pace; occasional interaction with supervisors/coworkers and the public; and limited to routine workplace changes.  (Tr. 1526-33.)

5.      The claimant is capable of performing past relevant work as a housekeeping cleaner.  (Tr. 1533-34.)  Claimant was born in 1965 and was 48 years old, which is defined as a younger individual age 45-49, on the date the application was filed and subsequently change age category to closely approaching advanced age.  (Tr. 1534.)  She has a limited education and can communicate in English.  (*Id.*)  Transferability of jobs skills is not an issue.  (*Id.*)  In addition to her past relevant work as a housekeeping cleaner, there are other jobs that exist in significant numbers in the national economy that claimant can perform considering her age, education, work experience, and residual functional capacity including garment sorter, classifier, and marker.  (Tr. 1534-35.)

Based on the foregoing, the ALJ determined that Ms. Beulah had not been under a disability since May 30, 2014, the date the application was filed.  (Tr. 1535.)

### V. Plaintiff's Arguments

Ms. Beulah argues that: (1) the ALJ erred in assigning only partial weight to the opinion of her treating psychiatrist Dr. Wilkes; (2) the ALJ erred by assigning partial weight to the opinions of the state agency psychological medical consultants but not including a limitation to "superficial" interaction; and (3) the ALJ's finding that Ms. Beulah could perform the physical demands of light work was not supported by substantial evidence. (ECF Doc. 16 pp. 20-29.)

41

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

42

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").   A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **First Assignment of Error: Whether ALJ Erred in Weighing Dr. Wilkes' Opinion**

Ms. Beulah argues that the ALJ erred by assigning partial weight to Dr. Wilkes' opinions that she "had a severely limited ability to deal with work stresses and complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and that "[s]he would have additional significant limitations, for example, in maintaining regular attendance and functioning independently without redirection."  (ECF Doc. 16 pp. 20-24.)

The "treating physician rule" applies because the earliest filing date for Ms. Beulah's claims was prior to March 27, 2017.  *See* U.S. Social Security Administration § DI 24503.050D.2.a.  Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent

43

with the other substantial evidence in the case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710

F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of*

*Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ gives a treating source's opinion less than controlling weight, she must provide

"good reasons" for the weight she assigns.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; .

In deciding the weight to be given, the ALJ should consider: (1) the length of the treatment

relationship and the frequency of the examination, (2) the nature and extent of the treatment

relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the

record as a whole, (5) the specialization of the source, and (6) any other factors that tend to

support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir.

2007); 20 C.F.R. § 404.1527(c).

The "good reasons" provided by the ALJ "must be supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting Soc. Sec. Rul. No. 96-

2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

When weighing the medical opinion evidence, the ALJ explained the weight she assigned

to Dr. Wilkes' opinion as follows:

> The undersigned declines to accord controlling weight to the March 14, 2016
> treating source statement by Gary Wilkes, M.D. Specifically, the undersigned
> accords partial weight to the opinion. Dr. Wilkes opined that the claimant could
> rarely deal with work stresses or complete a normal workday without interruption
> from psychologically based symptoms and perform at a consistent pace without an
> unreasonable number and length of rest periods (exh. 21F p.4). Dr. Wilkes opined
> that the claimant otherwise had an [sic] occasional to constant capabilities in other
> areas of functioning (exh. 21F). Dr. Wilkes provided no narrative to his check
> marked form, other to indicate that his marks were based on the claimant's
> ["]anxiety, mood swings." While Dr. Wilkes did have a significant treating

44

relationship with the claimant, <u>his assessment that she could not sustain a workday without unreasonable absences is not consistent with treatment records from Murtis Taylor or the totality of the record when the claimant adhered to a prescribed course of treatment</u>.

Treatment records from Murtis Taylor dated August 24, 2015, indicated that the claimant was off her medications. At that time, while not following a prescribed course of treatment, psychiatrist Irene Shulga, M.D., observed that the claimant was hopeless, demoralized, and was at substantial risk for suicide (exh. 16F p.7). The claimant was admitted to University Hospital for emergency inpatient treatment and her mood was stabilized with medication (exh. 24F). By October 15, 2015, treatment notes from Dr. Shulga confirmed that even with partial compliance with medication, the claimant's mood had stabilized and her sleep improved (exh. 16F p.12). She denied any thoughts of hurting herself and others, and demonstrated a good mood and adequate insight. On February 3, 2016, just prior to the date of Dr. Wilkes' opinion, Dr. Wilkes observed that the claimant's appetite and sleep were fair (exh. 22F p.4). She was coping well despite financial stress and problems with her landlord (exh. 22F). The claimant was casually dressed, with a fluid affect, clear & distinct speech and euthymic mood. Her thought process was logical and she had no reports of hallucinations or suicide (exh. 22F p.4). Dr. Wilkes noted that the claimant had been compliant with medications and felt like it was helping her (exh. 22F p.9). <u>The observations of Dr. Wilkes and Dr. Shulga do not support Dr. Wilkes' subsequent opinion at Exhibit 21F. Specifically, the psychiatrists' observations are consistent with an individual capable of performing simple routine work with adherence to a prescribe[d] course of treatment</u>.

(Tr. 1531-32 (emphasis added).)

Ms. Beulah contends that the ALJ's "limited review, and unfair emphasis on non-compliance, does not demonstrate that the treating physician opinion is either inconsistent or unsupported by the evidence nor does it represent good reasons for rejecting Dr. Wilkes's opinion." (ECF Doc. 16 p. 22.) In response, the Commissioner argues that the weighing of Dr. Wilkes' opinions was proper and supported by good reasons because the ALJ reasonably evaluated the record regarding Ms. Beulah's depression and anxiety, Dr. Wilkes used a checkbox form without providing a narrative explanation for his limitations, and Ms. Beulah's medication noncompliance was not specifically linked to her mental impairments. (ECF Doc. 19 pp. 10-12.)

The question for the Court's review in this assignment of error – whether the stated reasons for rejecting the opinion of Ms. Beulah's treating psychiatrist are supported by substantial evidence – was also the question before the court when Magistrate Judge Baughman considered whether the prior ALJ's decision in this matter was supported by substantial evidence. (Tr. 1694-1702.)  Magistrate Judge Baughman remanded the prior ALJ's decision, finding that "the RFC adopted by the ALJ lacks the support of substantial evidence because the ALJ did not properly analyze and articulate as to the opinion of psychiatrist Gary Wilkes, M.D." (Tr. 1702.)

When weighing Dr. Wilkes' opinions following the remand order, the ALJ assigned the opinion partial weight, taking issue with the opinion for two specific reasons.  (Tr. 1531-32.) First, she discounted the opinion because "Dr. Wilkes provided no narrative to his check marked form, other [than] to indicate that his marks were based on the claimant's [']anxiety, mood swings.'"  (Tr. 1532.)  Second, she discounted the opinion based on a finding that Dr. Wilkes' "assessment that [Ms. Beulah] could not sustain a workday without unreasonable absences is not consistent with treatment records from Murtis Taylor or the totality of the record when the claimant adhered to a prescribed course of treatment."  (*Id.*)  Both reasons are addressed below.

### 1. Whether Treating Psychiatrist's Use of Check Box Form Was Sufficient Reason for ALJ to Discount Treating Source Opinion

An ALJ may take into account the fact that the opinion is contained in a check box form when weighing the opinion, but a check box form is "not *per se* unreliable."  *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) (finding that "Dr. Chapman's checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it on these grounds," but explaining that "checklist opinions are not *per se* unreliable"); *see also Rueda v. Berryhill*, No. 1:17CV1878, 2018 WL 3304626, at *20 (N.D.

Ohio June 22, 2018), (indicating that "the Sixth Circuit has also found 'checklist opinions are not *per se* unreliable,' particularly when accompanied by an explanation for the findings") (citing *Kepke*, 636 Fed. App'x at 630), *report and recommendation adopted sub nom. Rueda v. Comm'r of Soc. Sec.*, No. 1:17CV1878, 2018 WL 3302928 (N.D. Ohio July 5, 2018).

As acknowledged by the ALJ, Dr. Wilkes explicitly stated his opinion was supported by Ms. Beulah's symptoms of anxiety and mood swings. (Tr. 1532, 1497.)  Moreover, as explained by Magistrate Judge Baughman (Tr. 1699-1700), the record before the ALJ contained significant treatment records from Murtis Taylor which discuss the objective findings, treatment modalities, and recommendations of Dr. Wilkes and his colleagues in relation to Ms. Beulah's mental health impairments. (Tr. 467-78, 955-69, 1159-76, 1500-11, 3047-3166.)  As discussed more fully below, those treatment records document providers' objective assessments of Ms. Beulah's symptoms, recommended treatment modalities, and Ms. Beulah's responses to treatment.  Thus, the undersigned finds that Dr. Wilkes' opinion is not wholly unexplained or unsupported, and the format of that opinion alone is not a sufficient basis to discount the opinion.

### 2. Whether Substantial Evidence Supported Finding That Treating Source Opinion of Dr. Wilkes Was Not Consistent with the Evidence of Record

In support of her decision not to afford controlling weight to Dr. Wilkes' opinion, and to afford partial weight instead, the ALJ explained that Dr. Wilkes' opinion that Ms. Beulah "could not sustain a workday without unreasonable absences" was "not consistent with treatment records from Murtis Taylor or the totality of the record when [Ms. Beulah] adhered to a prescribed course of treatment." (Tr. 1531.)  Ms. Beulah argues this finding is flawed because the ALJ's review was too limited, and because the ALJ improperly and unfairly emphasized noncompliance with medication. (ECF Doc. 16 pp. 21-22.)  She asserts that the ALJ's review of

47

the evidence was focused on only a few records, and disregarded other treatment records and opinions that were consistent with Dr. Wilkes' opinion.  (Doc. 16 pp. 22-23.)

Under the treating physician rule, "[t]reating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)).  Considering the ALJ's explanation for giving partial weight to Dr. Wilkes' opinion above, the primary question for determination in this assignment of error is thus whether substantial evidence supported the ALJ's conclusion that Dr. Wilkes' treating opinion regarding the ability to sustain a workday without unreasonable absences was inconsistent with the "treatment records from Murtis Taylor" and "the totality of the record."  (Tr. 1531.)

In support of her finding that Dr. Wilke's opinion was "not consistent" with Murtis Taylor records or the totality of the record "when the claimant adhered to a prescribed course of treatment," the ALJ cited to the following records:

- August 24, 2015 records from Murtis Taylor and University Hospitals, when Ms. Beulah was admitted for emergency inpatient psychiatric treatment for suicidal ideation after being off her psychiatric medications for two months.  (Tr. 1163-66, 1489-91.)

- October 15, 2015 Murtis Taylor records for pharmacological management with Dr. Shulga, where Ms. Beulah reported starting Lithium after her August 2015 admission and taking Lithium regularly, presented as irritable but otherwise largely normal on examination, and reported doing well, having good sleep with medication, and denying depression.  (Tr. 1167-70.)

- February 3, 2016 Murtis Taylor records for pharmacological management with Dr. Wilkes, where Ms. Beulah presented with normal mental status examination findings and reported being medication compliant and felt her medications were helping, but planned to ask her primary care physician to adjust her Trazadone due to problems sleeping.  (Tr. 1506-11.)

48

(Tr. 1532.)  The ALJ went on to conclude that the observations of Dr. Shulga and Dr. Wilkes in her October 2015 and February 2016 treatment visits "are consistent with an individual capable of performing simple routine work with adherence to a prescribe[d] course of treatment."  (*Id.*)

It is recognized that the records cited above reflect that Ms. Beulah experienced significant psychiatric symptoms leading to her hospitalization during a period of medication noncompliance, and that she reported improved psychiatric symptoms during two subsequent treatment visits when she was compliant with medications.  But the question before this Court is not whether Ms. Beulah's psychiatric symptoms episodically improved when she took her medications as prescribed.  The question is whether there is substantial evidence to support the ALJ's conclusion that Ms. Beulah's treatment records are "not consistent" with her treating psychiatrist's opinion that she would be unable to sustain a workday without unreasonable absences.  In other words, did Ms. Beulah's treatment records provide substantial evidence to support a finding that she <u>could</u> "sustain a workday without unreasonable absences" <u>so long as</u> she "adhered to a prescribed course of treatment."  (Tr. 1532.)

Upon review of both the records cited by the ALJ and Ms. Beulah's psychiatric treatment records as a whole, the undersigned concludes that the record does not contain substantial evidence to support an affirmative finding that Ms. Beulah was capable of sustaining a workday without unreasonable absences so long as she adhered to a prescribed course of treatment.  While the record certainly contains evidence suggesting her psychiatric symptoms sometimes improved when she took medications as prescribed, the undersigned was unable to identify sufficient evidence of stabilization during periods of medication compliance to support the ALJ's finding that Dr. Wilkes' treating opinion regarding her inability to sustain a workday without excessive absences was "not consistent" with her treatment records.

As an initial matter, the undersigned notes that the precise issue at the center of the determination in this case was already addressed by Magistrate Judge Baughman in remanding the prior ALJ decision, where he noted:

> Assuming *arguendo* that [Ms.] Beulah did show improvement from time to time, viewing the records of the [Murtis Taylor] Center longitudinally and holistically, she cycled between stability and instability. The records do not indicate improvement to the point where she could maintain an eight hour work day, five days a week within the standards set out by the VE.

(Tr. 1699 (citing records).) An independent review of the Murtis Taylor records by the undersigned was consistent with Magistrate Judge Baughman's earlier assessment. While the records do demonstrate episodes of improvement with medication, the undersigned was unable to identify clear sustained periods of stabilization with medication to support a finding that Dr. Wilkes' opinion regarding the ability to sustain work was "not consistent" with treatment records. Without restating the detailed medical treatment records outlined in Section II.B.1.i., *supra*, the undersigned has identified below some examples from the record that are illustrative of the lack of evidence of sustained stabilization with medication compliance.

In October 2014, Ms. Beulah reported her depression was better and she was tolerating Prozac and Risperdal, but still reported sitting at home, not wanting to do things, crying all the time, and feeling helpless. (Tr. 521.) Her depression was found to be "improved but not optimal." (*Id*.) By January 2015, she reported Prozac no longer helped her relax, exhibited a constricted affect, soft speech, and paranoia, and reported thoughts of hurting another person and chronic suicidal ideation. (Tr. 955, 957.) Her medications were adjusted, increasing Risperdal, decreasing Prozac, and adding hydroxyzine. (Tr. 957.) The next month, she reported some mood improvement, but also reported feeling like a "zombie" on Risperdal. (Tr. 960.) Her medications were continued, but she was found to have limited judgment and insight. (Tr. 961, 962.) In April 2015, she reported being "less depressed" and "managing [herself]," but

50

complained of weird and scary dreams and exhibited a blunted affect.  (Tr. 966, 967.)   Her Prozac was adjusted to further evaluate the cause of her bad dreams.  (Tr. 968.)

In August 2015, she was hospitalized for suicidal ideation with a plan to cut herself after being off her medications for two months, and explained she was experiencing increased adverse reactions on her medication regimen, such as worsening nightmares and suicidal ideation.  (Tr. 1161-66, 1489-91.)  While hospitalized, changes to her medications were made, including the addition of lithium.  (Tr. 1170, 1460.)  In October 2015, she reported doing "well" and denied depression, but became irritable when her needs were not met.  (Tr. 1170.)  She reported in February 2016 that her medication was helping, but also reported sleeping problems and an intent to speak to her primary care physician about medication adjustments.  (Tr. 1508.)

Later in 2016, she worsened again and was ultimately hospitalized in December 2016 due to suicidal ideation.  (Tr. 2096, 2099.)  A few months after her discharge, in April 2017, she was sleeping better but reported suicidal ideation, a depressed mood, and irritability.  (Tr. 2808.)  She was not taking one of her medications because she was paranoid about sleeping too long, and her medications were adjusted.  (*Id*.)  She reported improved mood and better sleep the following month, but still reported paranoia and suicidal ideation just one week earlier, when she reportedly felt "better off dead."  (Tr. 2874.)  In November 2017, she reported that Latuda helped her mood but not her sleep, that her mood swings were worse off her medications, that she had been burning herself with cigarettes since June 2017, and that she was having homicidal ideations. (Tr. 2995.)  Dr. Jones restarted her on lithium and Seroquel.  (Tr. 2997.)

In August 2018, she reported that she did not feel her medications were working and that Effexor made her sick.  (Tr. 3120.)  In her assessment, Nurse Harrison indicated she thought Ms. Beulah's "unresolved mood issues" were "partly due to noncompliance," but also opined that the

issues were also due to "not an adequate mood stabilizing dose." (Tr. 3126.)  Nurse Harrison discontinued Effexor, started Elavil, and increased the Seroquel dose. (Tr. 3124.)  Thereafter, the records indicate that Ms. Beulah continued to cycle between periods of stability and instability throughout 2018 and into 2019, with numerous medication adjustments. (Tr. 3062-74, 3075-85, 3086, 3100, 3109, 3119-29, 3131, 3145, 3155.)

Considered as a whole, there is no question that the medical records contain repeated instances of medication noncompliance concurrent with the worsening of Ms. Beulah's psychiatric symptoms.  There is also no question that the records also demonstrate episodes of improvement during periods of medication compliance.  What the records do not reflect is substantial evidence demonstrating that Ms. Beulah's symptoms improved with medication compliance to the point that she was able to sustain full time work without unreasonable absences, as necessary to find those records were "not consistent" with Dr. Wilkes' opinion.

To be sure, a failure to seek treatment for a mental disorder may suggest "an alleviation of [a Plaintiff's] symptoms," to the extent that "there is no evidence in the record explaining [the Plaintiff's] failure to seek treatment." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009).  Conversely, it is well established that "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White*, 572 F.3d at 283. Here, while there may be instances in the record where Ms. Beulah has not offered specific justifications for her noncompliance with treatment (ECF Doc. 19 p. 12), it is nevertheless clear from the record as a whole that Ms. Beulah repeatedly requested medication changes or discontinued use of medications based upon specific complaints of side effects or lack of effectiveness (*see, e.g.,* Tr. 469, 955, 960, 968, 1163, 1508, 2808, 2995, 3120, 3164), and in one instance reported discontinuing her medications specifically because of her suicidal ideations

(*see* Tr. 1605-6).  It is also evident from the record that periods of noncompliance more than

once led to significantly increased symptoms that resulted in a psychiatric inpatient admission.

(*See, e.g.,* Tr. 1163-65, 2000-4, 2008-10, 2086-89, 2099.)  None of these facts are consistent with

a finding that Ms. Beulah's noncompliance supplied substantial evidence to support the ALJ's

finding that the treatment records were not consistent with Dr. Wilkes' treating opinion.

Considering the severity of Ms. Beulah's periods of instability, and also considering the

lack of evidence of sustained improvement or stability with treatment, the undersigned cannot

conclude that substantial evidence supported the ALJ's finding that Dr. Wilkes' opinion as to

Ms. Beulah's inability to "sustain a workday without unreasonable absences" was "not consistent

with treatment records from Murtis Taylor or the totality of the record when the claimant

adhered to a prescribed course of treatment."

Accordingly, and for the reasons discussed in further detail above, the undersigned

concludes that the ALJ erred in articulating her reasons for assigning only partial weight to the

treating source opinion of Dr. Wilkes, and recommends remand so that the ALJ may reassess Dr.

Wilkes' opinion, and articulate her findings as to the weight given to the opinion based upon an

accurate and complete evaluation of Ms. Beulah's treatment records and other evidence.

**C.     Second Assignment of Error: Whether ALJ Erred in Assigning Partial Weight to State Agency Psychological Consultant Opinions Without Including Limitation to "Superficial" Interactions**

Ms. Beulah also argues the ALJ erred by failing to include limitations to "superficial"

interactions in the mental RFC after giving partial weight to the opinions of state agency

psychological consultants who included such a limitation in their medical opinions.  (ECF Doc.

16 pp. 24-26.)  The Commissioner responds that the caselaw cited by Ms. Beulah is inapposite

because it applied to situations where "great" or "significant" weight was applied to the relevant

opinion, rather than partial weight as in this case.  (ECF Doc. 19 p. 13.)  She further argues that

the ALJ impliedly rejected the limitation to "superficial" interaction because of evidence of improved mood and mental state when Ms. Beulah was compliant with her medications. (*Id.*)

Under the regulations applicable to the present claim, acceptable medical sources under 20 C.F.R. § 404.1513(a) can provide medical opinions, with treating source opinions being afforded more weight than a source who has simply examined the claimant, and examining sources being given more weight than a source who has not performed an examination, *see Gayheart*, 710 F.3d at 375 (6th Cir. 2013) (citing 20 C.F.R. § 404.1502, 404.1527). The opinions of nontreating and nonexamining sources – like the state agency consultants in this case – are simply weighed based on examining relationship, specialization, consistency, and supportability. *Id.* at 376 (citing § 404.1527(c)).

Relevant to the arguments raised by Ms. Beulah in this case, the four psychological consultants provided the following statements of opinion regarding social interaction limitations:

- Dr. Lai opined in September 2014: "Due to [Ms. Beulah's] psych conditions, she would likely have difficulty interacting with the general public on a regular basis and responding appropriately to criticism from others. She would be capable of relating adequately on a superficial basis in a setting that entails infrequent public contact, superficial interaction with coworkers, and no over-the-shoulder supervisor scrutiny." (Tr. 216.)

- Dr. Hoffman opined in January 2015: "She would be capable of relating adequately on a superficial basis in a setting that entails infrequent public contact, superficial interaction with coworkers, and no over-the-shoulder supervisor scrutiny." (Tr. 231.)

- Dr. Zeune opined in August 2017: "[Ms. Beulah] is able to interact superficially with coworkers." (Tr. 1671.)

- In November 2017, Dr. Murray-Hoffman adopted the prior ALJ RFC, which included a limitation to "occ superficial social interactions." (Tr. 1689.)

The ALJ thereafter assigned "partial weight" to the opinions of all four psychological consultants, explaining:

> The State agency concluded that the claimant was capable of simple routine tasks that do not require a rapid or consistent pace in a work setting that does not require adherence to strict time demands and deadlines. Additionally, she would need occasional flexibility in work shifts and break times when experiencing periods of increased symptoms. She would be capable of relating adequately on a superficial basis in a setting that entails infrequent public contact, superficial interaction with coworkers and no over the should [sic] supervisor scrutiny. She would be capable of adapting to minor changes in the workplace that could be easily explained. The undersigned generally concurs with this assessment, though has restated the mental residual functional capacity for clarity. Additionally, the undersigned finds that a flexible schedule is not supported by the record. Rather, the undersigned finds that the combined limiting effects of pain and her mental impairments allow the claimant to perform simple routine tasks with no more than routine workplace changes. This is supported by the claimant's ability to care for her daughters, her grandchild, and her home, while withstanding the stress of her families' lives.

(Tr. 1530-31 (emphasis added).)  Thus, having explained that she "generally concurred" with the state agency consultants' findings, but had "restated the mental functional capacity for clarity" (Tr. 1530), the ALJ adopted a limitation to "occasional interaction with supervisors/co-workers and the public" (Tr. 1526), without incorporating verbatim the state agency consultants' stated limitations to "infrequent public contact," "superficial interaction," "no over-the-shoulder supervisor scrutiny," and interactions "on a superficial basis" (Tr. 216, 231, 1671, 1689).

As a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) ("[A]n ALJ is not required to use 'the exact language of [the medical] professionals' when incorporating limitations in the RFC.") (quoting *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 436 (6th Cir. 2014)), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019). Even where an opinion is given great weight, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[] verbatim; nor is the ALJ required to

adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, at *7–8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

The Sixth Circuit's decision *Reeves* is of particular relevance here, as the court in that case specifically considered a situation where the state agency psychological consultants had found the plaintiff was "able to relate to a few familiar others on a <u>superficial</u> basis," and then concluded that the ALJ's RFC limitation to "only <u>occasional</u> interaction with the public" was "not inconsistent with either of the state agency psychologists' opinions" and was supported by substantial evidence. *Reeves*, 618 F. App'x at 275. The *Reeves* court noted that its findings were appropriate even though the opinions had been given "great weight." *Id.* In arguing that a similar finding is not appropriate in this case, Ms. Beulah does not specifically address the Sixth Circuit's holding in *Reeves*, relying instead on more recent unpublished court cases for the proposition that "[a]n ALJ may not replace a social functioning limitation regarding 'superficial' interactions with one regarding 'occasional' interactions, absent explanation." (ECF Doc. 16 pp. 25-26 (citing district court cases).) For the reasons stated below, the undersigned does not find Ms. Beulah's arguments convincing within the framework of this case.

It is true that Social Security Ruling 96-8p generally requires ALJs to consider all medical opinions in the RFC assessment and, if that assessment "conflicts with an opinion from a medical source," "explain why the opinion was not adopted." SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p). In this case, the ALJ did not suggest that a limitation to superficial interactions would "conflict" with a limitation to occasional interactions. As a matter

of logic, there is a clear potential overlap between the two terms, which is consistent with the Sixth Circuit's holding in *Reeves* that a limitation to "occasional" interactions was "not inconsistent" with opinions calling for "superficial" interactions.  *Reeves*, 618 F. App'x at 275. Without mentioning a conflict, the ALJ did explain that her modifications were intended to "clarify" the various limitations discussed by the psychological consultants.

A reframing of limitations for clarity, sometimes described as "convert[ing]" limitations "into vocationally relevant terms," can be a necessary tool before an ALJ poses a hypothetical limitation to a vocational expert.  *See Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (finding ALJ "reasonably converted and incorporated" medical opinions given great weight "into vocationally relevant terms in Plaintiff's RFC"), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019).  This is because SSA guidance states that VE testimony "generally should be consistent with the occupational information supplied by the DOT."  SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000).  Indeed, the Commissioner's internal manual instructs ALJs "not [to] permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise."  HALLEX I-2-6-74(C); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (finding HALLEX is "not binding on this court" but is persuasive authority).  Where a VE has based testimony "on an assumption," the manual requires ALJs to "ask the VE to clearly describe the assumption on the record."  *Id.*  Further, Social Security Ruling 00-4p provides that an ALJ may not rely on VE testimony that "is based on underlying assumptions or definitions that are inconsistent with [SSA's] regulatory policies or definitions."  SSR 00-4p, 2000 WL 1898704, *3.

In the context of this guidance, it is clear that VE testimony must be based on either the VE's own vocational expertise or information specifically set forth in the Dictionary of Occupational Titles ("DOT") or Selected Characteristics of Occupations ("SCO").  Conversely, VE testimony should <u>not</u> be based on conclusions outside the VE's expertise, assumptions not clearly described on the record, or assumptions or definitions that are inconsistent with the SSA's policies or definitions.  This is the framework in which the Court must consider the ALJ's restatement of the relevant social limitations for "clarity," in particular because the term that is the focus of Ms. Beulah's arguments in this case – "superficial" – is not a "vocationally relevant" or defined term in the DOT or SCO.

By way of contrast, the DOT and SCO do have specific defined terms for frequency, defining "occasional" activities and conditions as those existing up to 1/3 of the time.  *See Beasley v. Berryhill*, No. 5:16-CV-00108-LLK, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining that "[t]he terms 'occasional' and 'frequent' are terms of art in Social Security law [and] '[o]ccasional' means occurring from very little up to 1/3 of the time") (citing Social Security Ruling (SSR) 83-10, 1983 WL 31251); DICOT 979.687-034, Appendix C, 1991 WL 688702 (2016); SCODICOT Appendix C & D.  Other defined terms relating to social interactions include: mentoring, negotiating, instructing, supervising, diverting, persuading, speaking-signaling, serving, and taking instructions-helping.  *See* SCODICOT Appendix E; *see also Reese v. Saul,* No. 3:18-CV-442-HBG, 2020 WL 1312703, at *14 (E.D. Tenn. Mar. 19, 2020) (explaining that "the 'DOT ranks the degree of interaction with people in each job type' on a scale from 0 (Mentoring) to 8 (Taking Instructions-Helping), going from the highest to the lowest level of functioning") (quoting *Kane v. Saul*, No. 3:18-CV-746 (HEH), 2019 WL

7562760, at *15 (E.D. Va. Aug. 20, 2019), *report and recommendation adopted by*, 2020 WL

130134 (E.D. Va. Jan. 10, 2020)).

      In support of her argument that the ALJ failed to adequately justify her failure to include

a "superficial" interaction limitation in the RFC, Ms. Beulah cites to numerous unpublished

decisions which found ALJs had failed to adequately explain their omission of "superficial"

interaction limitations because "limiting the *quantity* of time spent with an individual does not

accommodate a limitation relating to the *quality* of the interactions."  (ECF Doc. 16 p. 25 (citing

cases).)  A review of the cited cases reveals that they are distinguishable from the present case.

First, those courts specifically found the ALJs had failed to explain their reasons for not adopting

the limitations, while the ALJ here explained that the language was changed for purposes of

clarity.  *See Corey v. Comm'r of Soc. Sec.*, No. 2:18-CV-1219, 2019 WL 3226945, at *4 (S.D.

Ohio July 17, 2019) ("[W]here, as here, the ALJ assigns significant weight to a particular

opinion and states it is consistent with the record, he must incorporate the opined limitations or

provide an explanation for declining to do so."); *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-CV-

18, 2018 WL 6257432, at *4-5 (S.D. Ohio Nov. 30, 2018) (same), *report and recommendation

adopted*, No. 2:18-CV-018, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019); *Hurley v. Berryhill*, No.

1:17-CV-421-TLS, 2018 WL 4214523, at *4 (N.D. Ind. Sept. 5, 2018) ("[T]here is no

explanation as to why the ALJ accepted the limitation of 'occasional interactions' but not

'superficial interactions' from the psychologists' opinions. This is especially problematic where

… the ALJ assigned the psychologists' opinion great weight due to how well they were

supported by the other evidence of record and how well they explained their conclusions.").

      Second, those cases involved opinions given "significant" or "great" weight, as opposed

to the partial weight granted in this case.  *Cf. Cook v. Commisioner of Soc. Sec.*, No. 2:19-CV-

4438, 2020 WL 3424502, at *6 (S.D. Ohio June 23, 2020) (finding ALJ giving partial weight to opinions "was not required to adopt each of their proposed limitations," and noting she "was not obligated to satisfy the reasons-giving requirement when she declined to adopt their proposed limitation" because the opinions were not from treating sources), *report and recommendation adopted sub nom. Cook v. Comm'r of Soc.* Sec., No. 2:19-CV-4438, 2021 WL 1090636 (S.D. Ohio Mar. 22, 2021).

Beyond the cases cited by Ms. Beulah, the undersigned notes that some courts have gone so far as to reject the explanation that "superficial" is not a vocationally relevant term, and have described "superficial" interaction as a "well-recognized, work-related limitation."  *See, e.g., Swank v. Comm'r of Soc. Sec.*, No. 2:20-CV-2396, 2021 WL 1345420, at *5 (S.D. Ohio Apr. 12, 2021), *report and recommendation adopted*, No. 2:20-CV-2396, 2021 WL 1909701 (S.D. Ohio May 12, 2021).  The undersigned disagrees, and finds on the contrary that it is of very direct and specific import to the issues presented in this case that "superficial" interaction does not have a defined meaning under the DOT or SCO.  It is also notable that dictionary definitions do not provide further clarity as to what work-related interactions are intended to be included or excluded by a limitation to "superficial" interactions.  *See, e.g.,* "Superficial." *Merriam-Webster's Unabridged Dictionary, Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/superficial. Accessed 11 Jan. 2022 ("not penetrating beneath or farther than the easily or quickly apprehended features of a thing: concerned only with the obvious or apparent"; "lacking in depth or substantial qualities: not profound"; "presenting only an appearance or a semblance: not far-reaching, significant, or genuine").

Given the lack of a defined meaning for the term "superficial," it is not clear from the record what specific manner of communications the psychological consultants intended to permit

or exclude when they limited Ms. Beulah to "superficial interaction," "no over-the-shoulder supervisor scrutiny," or interactions "on a superficial basis."   More importantly, if the ALJ had posed a hypothetical question limiting Ms. Beulah to "superficial interactions," as Ms. Beulah argues she should, SSA guidance suggests that it would have been improper for the ALJ to simply adopt that limitation without articulating a clear definition of the term on the record. *Compare Modro*, 2019 WL 1986522, at *6-7 (finding ALJ "reasonably converted and incorporated [medical] opinions into vocationally relevant terms" in the RFC, including a limitation to "occasional superficial contact … with superficial meaning no over-the-shoulder supervision; no tandem assignments; and no sales type transactions or customer-service interaction with the public.").  Moreover, in the event that the VE had provided jobs based on an RFC limiting Ms. Beulah to "superficial interactions," it would have been unclear, absent further explanation from the VE, what specific communications the VE interpreted the term "superficial" to permit or exclude.

In light of the foregoing findings and authority – specifically, that the Sixth Circuit has upheld the adoption of a similar RFC in similar circumstances, that the term "superficial" does not have a defined meaning for purposes of vocational testimony, that the ALJ clearly indicated that the undefined term was excluded for purposes of "clarity," and that the underlying medical opinions were given only partial weight  – the undersigned finds that Ms. Beula has not met her burden to demonstrate that the ALJ erred in failing to adopt the term "superficial" as a part of the mental RFC limitations applied in the case.

Nevertheless, since undersigned has recommended remand for further analysis of Dr. Wilkes' treating source opinion in Section VI.B.2., *supra*, the ALJ will have an opportunity on remand to consider whether the psychiatric consultants' opinions support additional limitations

as to the "quality" of interactions, and to offer any appropriate explanation as to any decision to include or exclude such limitations in the final RFC.

## D.  Third Assignment of Error: Whether Light Exertion Physical RFC Was Supported by Substantial Evidence

Ms. Beulah argues in her last assignment of error that the ALJ was not supported by substantial evidence in finding Ms. Beulah capable of performing the physical demands of light work, arguing the ALJ "cherry-picked" evidence to support a light exertional RFC and improperly relied on the opinion of a state agency medical consultant whose opinion was not based on a full review of the record.  (ECF Doc. 16 pp. 26-29.)  The Commissioner argues that the ALJ's light RFC is supported by substantial evidence and the ALJ did not improperly rely on the state agency medical consultants' opinion to support her physical RFC assessment.  (ECF Doc. 19 pp. 7-10.)

As detailed below, the undersigned concludes that the ALJ did not err in evaluating the relevant evidence, and that the ALJ's light physical RFC was supported by substantial evidence.

### 1.  Whether ALJ Improperly "Cherry-Picked" Evidence to Support RFC

Although an ALJ is not required to discuss every piece of evidence, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004), courts have found that "cherry-picking" or selectively including portions of the record that support a finding of no disability but excluding or failing to acknowledge other portions of the record that might support a finding of disability can lead to reversal or remand, *Anderson v. Comm'r of Soc. Sec.*, No. 3:20-CV-02728-JDG, 2022 WL 279856, at *11 (N.D. Ohio Jan. 31, 2022) (citing cases including *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)).  However, the Sixth Circuit has also explained that "cherry-picking" allegations "are 'seldom successful' because they essentially amount to a request that the court 're-weigh record evidence,' which we may not do." *Chicora v. Comm'r of*

*Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (quoting *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014)); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Ms. Beulah argues that the ALJ failed to review or incorporate key records relating to her physical functional abilities, including: evidence that she has osteoarthritis affecting her hips, knees, and shoulder; evidence that she suffers from SLE, causing cramping and swelling in her extremities and flare ups requiring steroids and hydroxycholorquine; abnormal examination findings, including reduced range of motion, weak pulses, crepitus; limitations in activity due to pain, edema and cramping; evidence of impaired gait, use of assistive devices, and falls; treatment with pain management specialists, including a ketamine infusion and lumbar injections; and her own testimony regarding the severity of her pain.  (ECF Doc. 16 pp. 27-28.)

Contrary to Ms. Beulah's assertions, a review of the ALJ decision reveals that the ALJ appropriately considered the relevant evidence, without resorting to improper "cherry picking." The ALJ detailed Ms. Beulah's treatment history relating to her physical impairments, including the SLE and osteoarthritis that caused her pain and limited her functional abilities.  (Tr. 1527-29.)  The ALJ considered evidence regarding Ms. Beulah's reported use of an assistive device. (Tr. 1527.)  The ALJ considered treatment for pain and subjective allegations of pain.  (Tr. 1526-27.)  The ALJ considered abnormal examination findings, including crepitus in the right knee and reduced range of motion in the wrist.  (Tr. 1527, 1528.)  The ALJ considered that Ms. Beulah was prescribed steroids and hydroxycholorquine and that she received a ketamine infusion.  (Tr. 1527-28.)  She considered that emergency treatment was required following a fall on the ice in 2015 and evidence of a subsequent fall in 2018.  (Tr. 1528.)  The ALJ also

considered evidence relating to swelling in Ms. Beulah's extremities and evidence of lupus flares.  (*Id*.)

Because the ALJ appropriately accounted for the types of evidence identified by Ms. Beulah, and did not engage in improper cherry picking, the present challenge "essentially amount[s] to a request that the court 're-weigh record evidence,' which we may not do." *Chicora*, 852 F. App'x 968, 971 (6th Cir. 2021).  It is not the role of this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d 383 at 387.

### 2.    Whether ALJ Properly Relied on State Agency Medical Consultant Dr. Siddiqui's Opinion to Support the Light Work RFC

In formulating her RFC, the ALJ concluded that the September 5, 2017 opinion of state agency medical consultant Dr. Siddiqui, opining that Ms. Beulah could perform a reduced range of light work, was entitled to "greater weight" than the earlier state agency medical consultant opinions that supported a medium residual functional capacity.  (Tr. 228-29, 1530, 1668-70.) The ALJ explained:

> As for the opinion evidence, the undersigned accords little weight to the State agency medical consultants' opinions at Exhibits 1A and 3A. The State agency concluded that the claimant could perform medium work. The State agency did not have the benefit of reviewing the record in its entirety. The <u>totality of the evidence submitted at the hearing level</u> demonstrates that the claimant's SLE limits the claimant to light work with adherence to a prescribed course of treatment. The undersigned accords greater weight to the subsequent State agency conclusion that the claimant could perform a reduced range of light work (exh. 7A). This is consistent with the evidence that suggests the claimant was able to independently care for herself, independently seek medical treatment, and be responsible for the care of an infant/toddler.

(Tr. 1530 (emphasis added).)  Ms. Beulah challenges the ALJ's reliance on this opinion because it "was based on review of a limited record since it contained only evidence obtained in the early stages of Ms. Beulah's second application."  (ECF Doc. 26 p. 28.)

"There is no categorical requirement that [a] non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011).  "The opinions need only be 'supported' by evidence in the case record."  *Id*.  The Sixth Circuit further explains: "before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (rejecting argument that there was a "blanket prohibition on an ALJ's adoption of a non-examining source opinion, where that source has not reviewed the entire record"); *Blakley*, 581 F.3d at 409 (indicating there must be "some indication that the ALJ at least considered" later medical records when greater weight is given to "an opinion that is not 'based on a review of a complete case record'") (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

While Dr. Siddiqui, like the other state agency medical consultants, did not have the benefit of the entire record, it is clear that the ALJ considered and made her decision based on the totality of the evidence submitted at the hearing level, including records from 2018 and 2019 that post-dated Dr. Siddiqui's opinion, when she concluded that the evidence supported a light RFC.  (Tr. 1528, 1530, 1531, 1533.)  Given these "indication[s] that the ALJ at least considered" later medical records, *Blakley*, 581 F.3d at 409, the undersigned finds that it was not error for the ALJ to rely in part on Dr. Siddiqui's opinion when finding Ms. Beulah capable of light work.

Ms. Beulah also argues that the ALJ's statement regarding the consistency of Dr. Siddiqui's opinion with the evidence "ignored Ms. Beulah's testimony that her son and daughter provided her daily assistance and that she had not cared for her grandson in a couple years." (ECF Doc. 26 p. 28.)  The evidence that Ms. Beulah points to as "ignored" by the ALJ is her

September 18, 2019 hearing testimony.  (ECF Doc. 26 p. 28 (citing Tr. 1597-99, 1607-08).)  On the contrary, the ALJ decision makes it clear that she did not ignore Ms. Beulah's testimony regarding assistance she received from her family, specifically acknowledging Ms. Beulah's testimony that she "relie[d] on family for assistance," "relie[d] on family to perform chores," and "receive[d] help from her family."  (Tr. 1525, 1530.)

The ALJ considered Ms. Beulah's testimony and subjective allegations regarding her daily activities, but found them not fully consistent with the entirety of the record.  (Tr. 1530.)  Ms. Beulah does not directly challenge the ALJ's evaluation of her subjective allegations or explain how this finding is unsupported by the record.  Thus, to the extent Ms. Beulah's challenge to the weighing of Dr. Siddiqui's opinion is premised on an alleged error in the evaluation of her subjective allegations, the argument is undeveloped and waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.") (internal citations omitted).

With respect to Ms. Beulah's assertion that the ALJ ignored testimony pertaining to when she cared for her grandson, the undersigned observes that the record supports the ALJ's finding that Ms. Beulah cared for her grandson.  (Tr. 1530; *see* Tr. 1529 (citing Tr. 2473 (2/16/17 CPST note indicating: "Virna expressed emotions including frustrations with current living situation and being responsible for grandson majority of the time.")), Tr. 2020 (12/5/16 psychiatric progress note indicating Ms. Beulah reported being "overwhelmed at home with young daughter with the grandson whom she needs to monitor and assist as the daughter works"); Tr. 2094 (2/1/17 CPST note indicating "Virna expressed ongoing frustration with daughter and caring for

grandson").)  The undersigned also notes that the ALJ acknowledged evidence suggesting Ms. Beulah's mental state may have prevented her from properly caring for her grandson at times. (Tr. 1529 (citing Tr. 2746 (8/2/16 Behavioral Health Assessment note indicating Ms. Beulah had "thoughts of hurting" her five-month-old grandson when he cried), Tr. 2758 (8/18/16 Psychiatric Evaluation indicating "last wk had thoughts of hurting grandson b/c he cries too much but denies intent or plan")).)

Considering the foregoing, the undersigned finds that the ALJ did not ignore evidence when weighing the consistency of Dr. Siddiqui's opinion with evidence of record.  Ms. Beulah also summarily states her "activities are not indicative of an ability to perform substantial gainful activity for eight hours a day nor the physical demands of light work."  (ECF Doc. 16 pp. 28-29 (citing See *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. App'x 852, 864 (6th Cir. 2011); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967).)  This underdeveloped argument does not alter the undersigned's above finding.   While it is true that the cases Ms. Beulah cites support the general proposition that a claimant's participation in minimal activities is not consistent with eight hours of sustained work activity supporting the proposition, an ALJ is not precluded from considering a claimant's activities of daily living when weighing evidence.  *See e.g.*, *Doornbos v. Comm'r of Soc. Sec.*, No. 17-1464, 2017 WL 8948744, at *4 (6th Cir. Dec. 13, 2017) (ALJ took into account claimant's activities of daily living when weighing a doctor's opinion); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (consideration of activities of daily living properly considered when evaluating a claim of disabling pain).  As explained above, the ALJ evaluated Ms. Beulah's subjective allegations and found them not entirely consistent with the entirety of the record (Tr. 1530), and Ms. Beulah has not sufficiently or clearly articulated a challenge to the ALJ's finding in this regard.

For all of the reasons set forth above, the undersigned finds that the ALJ's assignment of "greater weight" to the opinion of Dr. Siddiqui and reliance on that opinion when formulating Ms. Beulah's physical RFC was proper, and Ms. Beulah has not met her burden to demonstrate that the ALJ's physical RFC finding lacks the support of substantial evidence.  The undersigned accordingly finds Ms. Beulah's final assignment of error to be without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further proceedings.  Upon remand, the ALJ should reassess the treating source opinion of psychiatrist Gary Wilkes, M.D., and articulate any findings as to the weight given to that opinion based upon an accurate and complete evaluation of Ms. Beulah's treatment records and other relevant evidence.

March 25, 2022                                      */s/ Amanda M. Knapp*
                                                    AMANDA M. KNAPP
                                                    UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).